**In the Matter of Paul TIPPS East Oregon Company, Debtors.**

**Bankruptcy Nos. 3–83–00919, 3–82–03128.**

United States Bankruptcy Court, S.D. Ohio, W.D.

April 12, 1984.

Peter J. Donahue, Dayton, Ohio, for debtor.

Asher Bogin, Dayton, Ohio, for City-Wides.

Philip E. Langer, Dayton, Ohio, for First Nat'l Bank.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

Presently before the Court are objections to the confirmation of the First Amended Plan of Reorganization. A hearing was held on this matter on January 9, 1984. Post-hearing briefs were filed on February 8, February 22, and March 1, 1984.

## FACTS

On November 5, 1982, Debtor Paul Tipps filed a voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code in the Southern District of Ohio at Cincinnati. Tipps not only was the Chairman of the Ohio Democratic Party from 1975 to 1983 and Chairman of the Montgomery County Democratic Party from 1970 to 1977, but, also, he had been engaged in the business of real estate development, management and sale of businesses, and the formation of limited partnerships primarily in the Dayton and Cincinnati areas.

On December 8, 1982, the East Oregon Co., a corporation entirely owned by Paul Tipps and engaged in "Rehabilitation and land development" in Dayton, Ohio, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. By Order entered May 2, 1983, the corporation case was consolidated with the Tipps case upon application reciting "all of the debts incurred in the [Corporation case] arose out of service or material furnished to real estate which remains in the name of Paul Tipps. The Debtors had represented to creditors of East Oregon that the assets would be transferred to East Oregon Co., but the transfers never took place for tax reasons."

Tipps is currently self employed as a "Public Policy Consultant" (lobbyist), on a job by job basis, and does not have any term contracts for sustained employment or retainers. He testified that he in reality is on "a month to month contract" as a subcontractor for Urbanistics, Inc. and Gerald Austin and Associates. Even though his potential earning capacity is thus only conjectural both in amount and duration, the Debtor testified confidently, as follows:

Q. "I'm concerned with what assurance there is that there will be any income from this to you. Apparently from what you're saying there is no assurance, is that correct?

A. I think reasonable people would be able to conclude Mr. Bogin, that there is assurance. At least for three more years.

Q. I'm sorry?

A. I say at least for three more years.

Q. What is the assurance?

A. Well the assurance is that we have a democratic [sic] administration, and our interests are being promoted on that consideration. Now beyond that I can't say.

Q. But you have no understanding that you will be paid any given amount in any month or any year?

A. No, sir, I don't.

Q. And your association with those companies are the source of income from which you expect to fund the payments which this plan—which you propose in your plan?

A. Yes, sir."

The Original Plan of Reorganization and Disclosure Statement were filed on March 11, 1983, and a First Amended Plan and Amended Disclosure Statement were filed on July 29, 1983. This Court approved the Amended Disclosure Statement as constituting adequate information as defined in 11 U.S.C. § 1125 by Order dated November 15, 1983, on the condition it be amended to provide certain additional information as to funding and as to partnership assets. These changes were made and the Amended Disclosure Statement was mailed to all creditors and interested parties on December 9, 1983.

Section III, page 5, of the approved Disclosure Statement and verification by the testimony of Debtor reveal a total of secured and unsecured (not considering tax claims) debts in the amount of $5,041,-580.00. The statement reveals total assets valued at $1,640,000.00, as a maximum. Subsequently, the Plan was modified by Order dated January 11, 1984, to permit withdrawal of objections by The Provident Bank (Class 3), Home State Savings Association, The First National Bank, Dayton, Ohio.

All classes of creditors had then either accepted the Plan or did not vote, except City-Wide Development Corporation and City-Wide Building Finance Corporation ("City-Wides") which rejected the Plan. City-Wides are the only creditors in Class 4 of the Plan, with claims in excess of $600,-000.00. All the major creditors, who are secured in part, except City-Wides, accepted the Plan. Those accepting include the following: Class 3, Provident Bank for a claim of $599,818; Class 5, First National Bank for a claim of $2,394,436; and Class 6, Home State Savings & Loan Association for a claim of $687,801.

The Plan basically relies for funding on the future earnings of Debtor Tipps from his position as a consultant/lobbyist. His attorney has aptly summarized the Plan as follows:

"1. All real estate will be conveyed to secured creditors or abandoned, except for 2 properties.

(a) Debtor has a one-half interest in Boltin Apartments, on which there is a HUD mortgage. Debtor and his partner will bring the mortgage current or abandon the property. Mr. Tipps testified that the property could not be sold for the mortgage balance of $176,307.

(b) Debtor has a one-half interest in a double at 117–119 Clay Street, Oregon Village of Dayton. He testified that his partner did not wish to sell because of the tax recovery. He doubts that the property would bring much more than the balance on the mortgage of $139,597 to Home State Savings & Loan Association.

"2. Any secured creditors, who suffer a deficiency upon sale of the collateral, will be treated as unsecured as to the balance.

"3. All unsecured claims will share pro-rata in the fund of $255,000 to be paid by Mr. Tipps over 5 years in 60 equal payments of $4,250.00 per month.

"4. The Plan provides that all partnership interests would remain in Debtor's name because a transfer would precipitate tax recapture to all partners and there is no evidence that he has any real equity in these partnerships."

Administrative expenses and federal taxes also must be paid from the $255,000 funding.

The testimony of the Debtor constitutes the only evidence adduced as to the valuation of the assets of 22 partnerships in which Debtor owns varying interests. The nature of the partnership assets is very complex, ranging from rehabilitation properties in deplorable condition to relatively new multiple housing projects. He is a general partner in twenty-one of these partnerships. The gist of his testimony

would indicate that the Debtor has no "current income interest" in any of these assets. The testimony, nevertheless, is inconclusive as to market or liquidation values and the relative amounts of secured and unsecured debts based upon market values. The property in fourteen of the 22 partnerships is in the process of foreclosure or conveyance to the respective mortgages. The unsecured claims could not be liquidated under the Plan for several months pending completion of these ancillary proceedings, involving cross collateralization.

Under date of 13 March 1980 Debtor executed a Stock Purchase Agreement with Federal Property Management Corporation ("Federal") to sell his shares of no par capital stock in the corporation to Federal. The agreement contains several pages of data and stipulations, including the following:

"3. Tipps is a general partner in and has varying ownership interest in various limited partnerships (the "Partnership"), which Partnerships own residential real estate located at various locations all over the United States. The Partnerships are listed and identified on Exhibit C attached hereto and made a part hereof by reference, and are subject to regulations promulgated by the U.S. Department of Housing and Urban Development ("HUD"). Subject to the laws in the various states where the Partnerships have been formed or where the properties are located, and subject to the laws and regulations and any necessary approvals of HUD, and also subject to the provisions of the various Partnership Agreements as they now exist and to the rights of the other general and limited partners, Tipps agrees to the following:

(a) Tipps shall remain as general partner in the Partnerships and perform all his designated duties, obligations and responsibilities as general partner;

(b) To the extent that Tipps has the right to designate or participate in any decision to designate a managing agent for the Partnership, Tipps hereby agrees to designate and does designate Federal as the managing agent for the Part-

nerships. ("Managing Agent" as used herein means (1) the managing agent as ordinarily defined and empowered by HUD, and (2) an agent for the Partnership to perform all other management functions of the General Partner including without limitation the selection of insurance agents and companies, accountants, attorneys and vendors.) Federal shall receive fees and perform management services as managing agent as provided under and pursuant to the management agreement for each partnership, and as approved by HUD. If, for any reason, Federal ceases to be or has notice that it will cease to be managing agent for any of the projects, Tipps shall upon request from Federal use his best efforts to establish or maintain Federal as the managing agent.

(c) Nothing hereinabove to the contrary shall negate or inhibit Tipps' right and ability to perform and fulfill his fiduciary obligations and responsibilities and to make decisions and judgments based upon just cause under and pursuant to the provisions of the various partnership agreements in his capacity as a partner therein.

"4. Tipps shall, and hereby does, to the extent permitted by law and to the extent that this paragraph shall not cause or be construed by the Internal Revenue Service as a sale, assign Tipps' right to receive, after the date hereof, all cash flow, profits and losses in excess of Tipps' current rights in the Partnerships determined as if he were a limited partner. Excess sums would ordinarily be payable to Tipps as general partner of the Partnerships on sale or refinancing as set forth in the various agreements. Tipps, however, shall continue to be the owner of the current percentage of partnership interests now owned by him and be entitled on sale or refinancing to distributions of cash flow, profits and losses equivalent to his current percentage of ownership interest in the various Partnerships as if he were a limited partner,

recognizing that in most such instances Tipps' percentage will decrease. The parties acknowledge to one another that the method of assignment of the partnership participation interest to Federal has not been thoroughly studied by the parties, their attorneys, their accountants, and to that extent, this Agreement shall be deemed to be a letter of intent, and the parties shall, at a later date, enter into appropriate modifications and amendments to this Agreement to conform the intent of the parties to the actual mechanical partnership and tax law applicable to this transaction. It is the intent of the parties that from a partnership law and tax law point of view this assignment shall not be deemed a sale by Tipps and that neither Federal, Tipps nor the Partnership shall have adverse income tax consequences as the result of this assignment, meaning that property, cash flow, profits, or other sums flowing to Federal by virtue of the assignment hereby granted to Federal, shall not be income to Tipps, and to the extent that any sums are so treated by an taxing authority, this assignment shall be deemed automatically rescinded, voided and the actual dollars shall flow to Tipps to the extent necessary to pay any tax levied, assessed or otherwise charged to Tipps.

Federal shall indemnify and save harmless Tipps from and against any and all loss, costs, or liability, including the cost of counsel employed by Tipps to defend any claim, demand, cause of action, or potential liability, in connection with claims of any nature or kind made or arising out of Federal's performance of its agency responsibilities hereby delegated, whether pursuant to this Agreement or the management agreements with the various Partnerships."

On January 6, 1984, City-Wide Development Corporation and City-Wide Building Finance Corporation [City-Wides], which are both secured and unsecured creditors in the amount of $601,867.17, filed their Objections to Confirmation of the proposed Plan. City-Wides basically argue that 1)

the provisions for funding of the Plan are inadequate, 2) the proposed Plan does not provide for reasonable payment of unsecured creditors, 3) the proposed Plan does not assure that City-Wides will receive the same amount or more than it would receive under a Chapter 7 liquidation, as required by § 1129(a)(7)(A), and 4) the prerequisities for a "cram-down" over City-Wides' objections have not been met.

The provisions of the Plan as it pertains to Class IV reads, as follows:

"4. Debtor will convey to the Class 4 Creditor all of his right, title and interest in the following properties:

(a) Building at 303–313 Wayne Avenue, Dayton, Ohio 45402.

(b) Condominiums at 103 Van Buren Street, Dayton, Ohio 45402.

(c) Doubles at 8–12 and 16–20 Clay Street, Dayton, Ohio 45402.

The Class 4 Creditor will in turn complete the development and renovation of these properties with the consent of the Class 5 Creditor, The First National Bank, Dayton, Ohio, and obtain the release of the Debtor from the secured portion of all liabilities of Debtor to First National Bank, relating to these properties. If this proposal is not satisfactory, the Debtor abandons any interest in the properties at 303–313 Wayne Avenue, 103 Van Buren Street and 8–12–16–20 Clay Street, since there is no equity in the Debtor."

There is still incompleted renovation expenditures on these properties.

## DISCUSSION

The contesting parties have at great length offered sophisticated arguments as to whether the Proposed Plan is in the best interests of the creditors conformably to the requirements of 11 U.S.C. § 1129(a)(7)(A), and what distribution unsecured creditors can anticipate after the payment of secured claims and priority claims. Based upon the only competent evidence adduced it is doubtful that these creditors would receive less under the Plan than they

would under a Chapter 7 liquidation. The Court can draw no reliable conclusions scientifically from the brief, sketchy evidence of valuation submitted. The dividend to unsecured Creditors (Class 10) ranges from a 4% contention by objectors to a 12% contention in behalf of Debtor, funded from $255,000.00 personal earnings to be contributed by Debtor.

Assuming, *arguendo*, that the negative valuation statistics and arguments as to estate assets submitted by the Debtor must be taken as conclusive, it is obvious that the $255,000.00 to be paid by the Debtor over five years at $4,250.00 per month would weigh favorably against problematical market values. Certainly, the Debtor should be then commended for Herculean efforts in an attempt to subsidize from future personal earnings what has been an undeniable economic disaster. It is unnecessary to request supplemental evidence in this regard, however, because other determinative legal requirements dictate a denial of confirmation of the Plan *sub judice*, despite the admirable attitude evinced by the Debtor. His actual net earnings progressively declined from a rounded total figure of $62,000 in November, 1983 against expenses of $59,000; $49,500 in December, 1983 against expenses of $43,-000; and $54,000 against expenses of $52,-000 in January, 1984.

## II

City-Wides have raised multipronged objections to confirmation of the Plan of Reorganization. Essentially, the various issues presented pertain to the fair and equitable nature of the provisions of the Plan for this dissenting class (Class 4) and to the provisions of 11 U.S.C. § 1129(a)(11), which require the court to find "the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor...."

Although tomes have been written on the historical derivation of these concepts as modified by the Bankruptcy Reform Act of 1978 (traditionally termed, "feasibility", and "cram-down"), the application to specific facts is more than merely an exercise in sterile mathematical formulae. The contesting parties in this case have rationalized very skillfully in an effort to render certain the multifarious business affairs of the debtor. Notwithstanding, the asset valuation evidence is nebulous and may be categorized somewhere between acknowledged frustration and a proffered reliance upon projected future earnings based upon the Debtor's successful track record of profiting from influencing public officials and especially members of the legislature.

Based upon this past financial success the Debtor has devised a plan which offers each of ten classes a very sophisticated scheme which at least ostensibly is to their best interests and "fair and equitable". City-Wides, real estate mortgagees owed a balance in excess of $600,000.00, are the only members of Class 4. Looking to the alternative means of satisfying such a dissenting secured creditor conformably to 11 U.S.C. § 1129(b)(2)(A), it is noted that the question of lien retention and deferred cash payments totaling at least the value of the claim as of the effective date of the Plan is rendered moot by a proposed conveyance of the collateral to City-Wides. The Debtor also thusly moots the question of the sale of the collateral free and clear of City-Wides' lien, because title can be taken by City-Wides and there would be no purpose in the determination of the value of the collateral and the extent of the resulting secured claim of junior creditors, if any. *See* 11 U.S.C. § 1129(b)(2)(A)(ii).

Hence, the ultimate question is whether in dissenting City-Wides are provided a realization of the "indubitable equivalent" of its secured claim. Judge Learned Hand in his now celebrated opinion in *In Re Murel Holding Corp.*, 75 F.2d 941 (CA2, 1935) certainly contemplated considerable judicial discretion to be lodged in the courts in providing adequate compensation which is "completely compensatory" and "the most indubitable equivalence."

From the legislative history of 11 U.S.C. § 1129(b)(2)(A)(ii) it is obvious that, "Abandonment of the collateral to the creditor

would clearly satisfy indubitable equivalence, as would a lien on similar collateral." *See, Collier Pamphlet Edition,* Bankruptcy Code, Part 1, § 1129 Legislative History, at page 538.

The Plan, however, specifies that, "The Class 4 Creditor [after the conveyance of the various parcels] will in turn complete the development and renovation of these properties with the consent of the Class 5 Creditor, First National Bank, Dayton, Ohio, and obtain the release of the Debtor from the secured portion of all liabilities of Debtor to First National Bank, Dayton, Ohio, relating to these properties."

The Unsecured Creditors are Class 10. This Class would receive cash distributions from the cash funds of debtor in the gross total amount of $255,000.00 of as much as 12% of their claims. The major secured creditors are City-Wides and First National Bank, which hold total claims of at least $2,996,000.00, in which there is an anticipated unsecured deficiency of at least $1,500,000.00.

Without regard to the complicated details of all of the claims junior to Class 4 (and Class 5 which is First National Bank) it is critical to observe that the deficiency of Class 4 is subservient to Class 10 because the deficiency is computed by the added burden of the post confirmation completion of the "development and renovation" costs and obtaining the release of Debtor's secured liability to Class 5. The Debtor and the Unsecured General Creditors (Class 10), will receive benefits before the value of the Class 4 secured claim has been paid in full because of the qualifications to the vesting of title.

By combining the effect of "absolute priority rule" with the requirement of the "indubitable equivalence" it must be concluded that the Plan does "discriminate unfairly" and is not "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan." 11 U.S.C. § 1129(b)(1). The secured portions of the claims of City-Wides are encumbered with post confirmation burdens which derogate from the value of their claims because the net interest of such creditors would be diminished without a corresponding increase in the amount distributed ahead of other unsecured class 10 creditors. Even more critically in this regard, pursuant to the complicated agreement with Federal Property Management Corporation, the Debtor retains residual partnership interests in at least 8 projects ahead a dissenting class, which is both secured and unsecured.

III

Assuming, *arguendo,* that City-Wide as a senior class would waive the effect of the "absolute priority" rule and "fair and equitable" treatment as modified by and now condoned in 11 U.S.C. § 1129(b)(8), the court would be constrained to deny confirmation of any plan based upon the Chapter 11 estate as it has been established and now exists.

Since it has been strenuously urged in behalf of the Debtor that no income or capital realization can be expected from any of the housing developments in which Tipps owns interests because "ownership of inner-city rehabilitation projects are [sic] no longer attractive", the court must confine attention to the feasibility of the plan funding from personal earnings. It is necessary further to focus attention to the nature of the funding as a Chapter 11 estate per se. The debtor has made it clear that he owns no interests in any choses in action or executory employment contracts which might be subject to assumption by the estate.

Under 11 U.S.C. § 541(a)(1) the commencement of the case created an estate consisting of "all legal or equitable interests of the debtor in property *as of the commencement of the case."* [emphasis added] Under § 541(a)(6) the estate further includes "Proceeds, product, offspring, rents, and profits of or from property of the estate, *except such as are earnings from services performed by an indi-*

vidual debtor after the commencement of the case." [emphasis added] *

Pursuant to § 541(a)(7) the estate further includes "any interest in property that the estate acquires after the commencement of the case." [emphasis added].

The explicit exclusion of "earnings from services performed by an individual debtor after the commencement of the case" might seem superficially inconsistent with the effect of Code §§ 1107 and 1108 empowering the debtor in possession to operate the business without court order. See In Re Fitzsimmons, 20 B.R. 237, 9 B.C.D. 154, B.L.D. (CCH) ¶ 68708, 6 C.B.C.2d 887. (Bkrtcy.App. 9th Cir.1982).** The dilemma, is not, however, resolved by rationalizing the right to expand estate property by contributions of the Debtor, if voluntary. Certainly the estate can accept contributions, even though not mandated, which reflect on the best interest of creditors. Future earnings from corporate and partnership entities, as Debtors, usually fund non-liquidating plans of "reorganization", when combined with other estate property.

Voluntary contributions of future earnings by an individual would in effect be assignments of earnings. The crucial test is not the right of an individual to commit future earnings to the best interest of creditors. Rather, the crucial judicial determination is the feasibility of such admirable good intentions not coupled with a legal interest.

A Chapter 11 individual proprietorship may conceivably have income from other sources than the personal earnings of the debtor. In this respect, the property of the estate would be determined by the "entity" principles endemic in bankruptcy case administration 11 U.S.C. § 101(14). For instance, typically income may be derived from other property of the estate, such as capital assets, services performed by employees of the business (other than the debtor), choses in action, established busi-

ness goodwill, and other ancillary income not the direct result of debtor's labor. In the instant case, however, there is no evidence of such ancillary estate property.

The court as a condition of confirmation must make a finding that "confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The Debtor has no present property interests in the future earnings. In fact, he does not even have a contract of employment. There is, therefore, neither chose in action nor property of any kind in actual or potential existence which can for instance by law be sold or taken on execution. The Code expressly excludes from the jurisdiction of a court "personal earnings" as such. Feasibility as a bare minimum would demand an assignment coupled with a legal interest or the possibility of a legal interest. If there were an assignable contract in existence to provide consulting services in futuro, such a contract would be property of the estate. Under the facts sub judice, however, the debtor is paid strictly on an ad hoc basis and there is no contract or other chose in action which is assignable upon which the court could make a valuation for feasibility purposes.

The absence of jurisdiction of this Court over a Chapter 11 estate to be used to fund or implement the Plan is further emphasized by the record of earnings income and the expenses of the debtor since November, 1983.

The court concludes, therefore, that confirmation of the Plan of Reorganization, as Amended, must be denied and judgment entered accordingly.

---

* 11 U.S.C. § 1306 which significantly adds to § 541 property of the estate property "the debtor acquires after the commencement of the case..." and "earnings from services performed

by the debtor after the commencement of the case..."

** Affirmed by Court of Appeals of the Ninth Circuit, 725 F.2d 1208, 1984, 11 B.C.D. 799.