**In re SANDY RIDGE DEVELOPMENT CORPORATION, Debtor.**

**Bankruptcy No. 86–00287.**

United States Bankruptcy Court, M.D. Louisiana.

Aug. 11, 1987.

Jack P. Harris of Baton Rouge, La., for debtor.

## REASONS FOR DECISION

WESLEY W. STEEN, Bankruptcy Judge.

### I. Jurisdiction of the Court

This is a proceeding arising under Title 11 U.S.C. The United States District Court for the Middle District of Louisiana has original jurisdiction pursuant to 28 U.S.C. § 1334(b). By Local Rule 29, under the authority of 28 U.S.C. § 157(a), the United States District Court for the Middle District of Louisiana referred all such cases to the Bankruptcy Judge for the district and ordered the Bankruptcy Judge to exercise all authority permitted by 28 U.S.C. § 157.

This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(L); pursuant to 28 U.S.C. § 157(b)(1), the Bankruptcy Judge for this district may hear and determine all core proceedings arising in a case under Title 11 referred under 28 U.S.C. § 157(a), and the Bankruptcy Judge may enter appropriate orders and judgments.

No party has objected to the exercise of jurisdiction by the Bankruptcy Judge. No party has filed a motion for discretionary abstention pursuant to 28 U.S.C. § 1334(c)(1) or pursuant to 11 U.S.C. § 305. No party has filed a timely motion for mandatory abstention under 28 U.S.C. § 1334(c)(2). No party has filed a motion under 28 U.S.C. § 157(d) to withdraw all or part of the case or any proceeding thereunder, and the District Court has not done so on its own motion.

### II. The Facts

The principal creditors are Louisiana National Bank ("LNB") and Livingston Bank.

(1) The Debtor owes LNB about $2.4 million,[1] secured by a first mortgage on immovable (e.g. "real") property:

---

1. LNB Exhibit 13.

"Brightside"; John Wiese and John Hamilton have guaranteed this debt up to $2.1 million;[2] H.E. Wiese guaranteed the debt up to $300,000.[3]

(2) The Debtor owes C.V. Richards $2,500 secured by a first mortgage on immovable property: "Port Vincent".[4]

(3) The Debtor owes Livingston Bank about $560,000 secured by a second mortgage on Port Vincent.[5]

(4) There is a third mortgage on Port Vincent in favor of LNB in the amount of about $100,000; it appears that the Debtor is not personally liable on this obligation.

(5) The unsecured claims are about $672,000.[6]

The appraisers who testified about the value of the assets differed in their opinions of value. In tabular form, the Debtor's assets and secured liabilities are as follows:

| | Property | Appraisers' Range of Fair Market Value | Lien | Lienholder | Rank |
|---|---|---|---|---|---|
| 1. | Brightside | $1.1–$2.4 million | $2.4 million | LNB | First |
| 2. | Port Vincent | $260,000–$1.1 million | $2,500 | C.V. Richards | First |
| | | | $560,000 | Livingston Bank | Second |
| | | | $100,000 | LNB | Third |
| 3. | Miscellaneous assets | principally $138,000 of sewer equipment | no lien | | |
| 4. | A lender liability lawsuit against LNB | unknown value | no lien | | |

The Debtor proposes a liquidating plan of reorganization in which "[i]t is clear that the unsecureds, Class 6, will not be paid one hundred (100%) percent ..."[7] The plan proposes:

(1) To transfer Brightside to LNB for a credit equal to the fair market value of Brightside.[8]

(2) "To the extent that Louisiana National Bank is owed additional monies, the debtor shall transfer sufficient property from [Port Vincent] up to One Hundred Thousand and no/100 ($100,000) Dollars, for a fair market value credit on the indebtedness to the extent of One Hundred Thousand and no/100 ($100,000) Dollars." There is no method established in the plan for determining *what part* of Port Vincent will be transferred to LNB and what part will be retained. There is also no indication of whether LNB will receive an undivided percentage of the whole property or a subdivided portion of the tract.

(3) The transfer to Livingston Bank of "sufficient property from [Port Vincent] ... in full satisfaction of the

2. LNB Exhibit 6.

3. LNB Exhibit 14.

4. Pleading No. 36; Debtor's memorandum in support of plan confirmation.

5. Livingston Bank Proof of Claim.

6. Pleading No. 36; Debtor's memorandum in support of plan confirmation.

7. Pleading No. 36; Debtor's memorandum in support of plan confirmation.

8. The plan is remarkably unclear about this concept of "transfer in satisfaction of claim." If the plan simply provided for abandonment of the property, most of the remainder of this opinion would be unnecessary. LNB's and Livingston's unsecured claims, if any, would be established by appraisal testimony and the plan might be confirmed. According to LNB's brief, it would not oppose such a plan. The Debtor insists, however, on a plan provision that results in *satisfaction* of the secured claims to the extent of the Court's valuation of the real estate. While the Debtor asserts that this has no collateral consequences, its refusal to use the alternative, conceded provision argues that the Debtor does indeed intend different consequences.

indebtedness to this creditor." There is no method established in the plan for determining *what part* of Port Vincent will be transferred to Livingston Bank and what part will be retained. There is also no indication of whether Livingston Bank will receive an undivided percentage of the whole property or a subdivided portion of the tract.

(4) The remaining property is to be sold and the proceeds (along with any judgment proceeds from the LNB suit) distributed to unsecured creditors. There is no timetable or method established for the sale, no minimum price; in short, the plan merely says that the property will be sold.

There are seven classes of creditors established in the plan:

(1) Administrative expenses entitled to priority (unknown amount);

(2) Tax claims (less than $10,000);

(3) LNB ($2.4 million plus $100,000);

(4) Livingston Bank ($560,000);

(5) Clay Richards ($2,500);

(6) Unsecured creditors ($672,000);

(7) John Wiese and J.B. Hamilton (equity holders).

Only the tax claimants (Class 2) and Clay Richards (Class 5) accepted the plan. The plan proposed to pay tax claims in full (including interest) by the sale of real estate; presumably the liens remain and thus these creditors, although technically impaired, are not seriously affected adversely. Clay Richards is also technically impaired, but not seriously; his claim of $2,500 is to be paid in cash "... from property not of the estate, but to be paid by an individual, within thirty days following the signing of the order of confirmation." The plan does not identify the "individual" who will pay Clay Richards or whether that individual will be subrogated to Clay Richard's claim. Presumably Clay Richards retains his lien until payment, but the plan does not so state. Thus the plan meets the § 1129(a)(10) requirement only

by providing for two classes to be paid in cash shortly after, rather than on, the effective date of the plan; the debt owed these accepting classes is less than 0.33% of the total debt: $12,500 of $3.74 million.

### III. Cramdown on a Secured Class Paid With Transfers of Tangible Property

Bankruptcy Code § 1129(b)(2) requires confirmation of a Chapter 11 plan on request of the proponent despite rejection of the plan by one or more classes if the plan does not discriminate unfairly and if the plan is "fair and equitable." There is no substantial question raised in this case about unfair discrimination. With respect to secured creditors, the phrase "fair and equitable ... includes" the satisfaction of one of the following three tests by the provisions of the plan:

(1) The creditor is to retain his lien and is to receive *cash payments* which have a present value equal to the claim;

(2) The property is to be sold under the plan, and the creditor either receives the sales proceeds or the "indubitable equivalent" of the sales proceeds; or

(3) The creditor realizes the "indubitable equivalent" of his claim.

But "fair and equitable" means more than merely meeting these specific tests. The statute so provides: "In this title 'includes' and 'including' are not limiting."[9] The legislative history[10] indicates that the statute is a codification of *American Surety Co. v. Marotta*, 287 U.S. 513, 53 S.Ct. 260, 77 L.Ed. 466 (1933) which states:

"In definitive provisions of statutes and other writings, 'include' is frequently, if not generally, used as a word of extension or enlargement rather than as one of limitation or enumeration."

The legislative history of the Code also supports an expansive reading of the phrase "fair and equitable."

"Although many of the factors interpreting 'fair and equitable' are specified ... others, which were explicated in the ... House report were omitted from the

---

**9.** 11 U.S.C. § 102(3).

**10.** H.Rep. 95–595, pp. 315, 316, U.S.Code Cong. & Admin.News 1978, p. 5787.

House amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to a 'fair and equitable' treatment of a dissenting class." [11]

Although it is thus clear that to be "fair and equitable" a plan must do more than merely meet the specific requirements of § 1129(b)(2)(B), it is not clear what those additional requirements might be. It appears from the referenced House report that Congress was primarily concerned with assurance that senior classes not receive more than 100% of their claims if there were dissenting junior classes; that question will be discussed in more detail below. The question addressed at this point in this opinion is whether a plan is fair and equitable if it requires a secured creditor to take real estate in satisfaction of his claim. The evolution of the bill in its journey through Congress shows a lack of complete agreement between the House and Senate over the use of property to pay secured creditors. H.R. 8200, the original House bill, provided that a plan could be crammed down:

> "[I]f with respect to each class of secured claims ... each holder of a claim of such class will receive or return under the plan ... *property* of a value ... equal to the allowed amount of such claim ..." [12] [Emphasis supplied.]

The report of the House Judiciary Committee elaborated on this concept of payment of secured claims with tangible property.

> "Specifically, the court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property of a value equal to the allowed amount of their secured claims as determined under proposed 11 U.S.C. 506(a). The property is to be valued as of the effective date of

the plan, thus recognizing the time-value of money. As used throughout this subsection, 'property' includes both tangible and intangible property, such as a security of the debtor or a successor to the debtor under a reorganization plan.[13]

However, this language about payment of secured creditors with property was not enacted. As noted above, the statute contains three provisions for payment of secured creditors; two involve payments in cash and the third calls for the realization of the "indubitable equivalent"; the only explanation in the legislative history about indubitable equivalence is a reference to abandonment of collateral. There is no explicit statement in the statute *as enacted* for cramdown of a plan on secured creditors calling for payment in property.

The deletion of the H.R. 8200 language and enactment of language calling for payment in *cash* or the indubitable equivalence, is significant. If Congress wanted to provide for payment of secured creditors in property, it could have left H.R. 8200 alone.

■ I conclude that Congress refined its language to the result that payment in cash is specifically authorized and that payment in property is permissible in cramdown only if that transaction is the indubitable equivalence of cash paid on sale or in installments secured by a lien.

### IV. Analysis of § 1129(b)(2)(A)(iii)

No one contends that these plans can be confirmed under § 1129(b)(2)(A)(i) or (ii). Therefore, this discussion will be limited to § 1129(b)(2)(A)(iii). That section requires that the secured creditor *realize* the *indubitable* equivalent of a claim.

Section 1129(b)(2)(A)(iii) uses the concept of "realization" of full value by the creditor. Assuming that property can be transferred to a secured creditor in satisfaction

---

11. Cong.Rec.Daily Ed. 10/6/78, 317420; 9/28/78 H11104.

12. § 1129(b)(1)(B)(iii), H.R. 8200, 95th Congress, 1st Session, as reported by the House Committee of the Judiciary, Sept. 8, 1977.

13. H.Rep. 95–595, p. 413, U.S.Code Cong. & Admin.News 1978, p. 6369. The Debtor's memorandum cites this language from the Committee Report but does not note, as does *Collier on Bankruptcy* on page 1129–37, that this language was not adopted by the Congress.

of a debt, it apparently is not enough that the property be appraised or valued as equal to the amount of the claim; the creditor must "realize" the equivalent of his claim.

Not only must the Court conclude that the equivalent will be "realized", but that conclusion must be "indubitable." One is impressed with the burden that such a test involves when one considers that "indubitable" connotes a conclusion more certain than proof by a preponderance of the evidence and even beyond "a reasonable doubt"; the conclusion must be *in* dubitable. If reasonable people can differ on the valuation of property, the valuation might be proved by a preponderence of the evidence but the conclusion would not be "indubitable." It is hard to imagine an appraisal that is "indubitable."

This conclusion is supported not only by the words used by the statute but also by a fair reading of the other subsections of the statute. If the "equivalence" need not truly be "indubitable", then § 1129(b)(2)(A)(ii) becomes much less meaningful. That provision allows the Debtor to provide in the plan for the sale of property and the payment of the proceeds to the secured creditor. The provision is much less meaningful if the cramdown can be achieved instead by a battle of the appraisers at the confirmation hearing.

## V. Does *Sun Country* [14] Illuminate the Issue?

Since *Sun Country* is cited by the Debtor as the sole circuit court authority on this issue, close examination of the case is appropriate. In *Sun Country*, the creditor received "property" in satisfaction of his claim, but the "property" was not tangible property involving highly imprecise and difficult valuation; the "property" in *Sun Country* was a right to payment in cash: a right represented by promissory notes. The valuation of such an asset involves only two real questions: (i) creditworthiness and (ii) prevailing interest rates. There was apparently no question raised in the case about the latter. The decision discussed the former; the Court concluded

that the creditor would realize "indubitable" equivalence, but the Court reached that conclusion only after the Court determined that there was no real probability of loss on collection; this finding was based on the collection history of these notes and on the finding that the value of the collateral for the notes was about 200% of the debt.

*Sun Country*, therefore, is not authority for the proposition that tangible property can be transferred in satisfaction of secured debt merely by producing appraisal testimony that the property has value equal to the amount of the claim. The holding of *Sun Country* is that a creditor who receives promissory notes with a value equal to his claim has received the indubitable equivalent of his claim. The Court held that the value of the notes was equal to the value of the claim because it concluded that the creditor would eventually receive cash equal to the present value of its claim.

It would be possible to design a plan calling for a transfer of tangible property that would be failsafe for confirmation under § 1129(b)(2)(A)(iii). But there is a reason, purely from the Debtor's perspective, why such a provision is not appropriate; there is also a reason why such a provision could not be crammed down on a dissenting junior creditor. To confect such a transfer, the plan would necessarily include a surplus of value, a margin of allowance for error, so that the realization of equivalence would be indubitable. Thus, if the creditor were owed $154,000, the plan might meet the § 1129(b)(2)(A)(iii) test by transferring to the creditor $287,000 worth of tangible property. *Sun Country* involved a very similar provision; the $154,000 promise to pay was *secured* by $287,000 of collateral; but *Sun Country* does not involve 200% payment, but rather 200% security for 100% payment. It stretches the imagination to hypothesize a debtor financially troubled enough to file a bankruptcy petition yet financially flush and generous enough to pay 200% dividends to creditors. The example is exaggerated only to empha-

14. *In re Sun Country Development, Inc.*, 764 F.2d 406 (5th Cir., 1985).

size and to clarify the parallel to *Sun Country*.

A provision for forced payment in property that is generous enough to satisfy the test of "indubitable equivalence" would necessarily include substantial margins for valuation error that will result in a transfer of more value to the creditor than necessary to satisfy the secured claim. While such a plan might be confirmed with the consent of junior classes in some circumstances, overpayment of senior creditors apparently cannot be crammed down over junior dissenting creditors.[15]

The Debtor has argued that these conclusions pretermit confirmation of plans in which property is transferred in satisfaction of secured claims. Such a conclusion is unwarranted.

(1) Some property might not involve serious valuation questions.

(a) *Sun Country* is an example in which the property transferred was susceptible of precise valuation;[16] the difficulty in that case was in valuing the collateral for the notes, but the value of the collateral so far exceeded the value of the notes that realization of equivalence was indubitable. The creditor in *Sun Country* knew *exactly* how much he would *realize* because the "property" he would eventually "realize" was denominated in dollars with an interest rate that accounted for changes in the value of the dollar and the passage of time; the issue in *Sun Country*, therefore, was not really whether the creditor could be paid in property. As noted above, what the creditor received in *Sun Country* was simply another promise to pay—the promise of third parties secured by alternative collateral instead of the promise of the debtor secured by the debtor's existing collateral. The Court simply held that the alternative promises to pay the same sum of money were indubitably equivalent.

(b) The value of some property might be easily and precisely ascertained. The easiest example is highly liquid property regularly trading in efficient markets. Even then, the timing of valuation and payment might be significant.

(2) More important, plans confirmed consensually (under § 1129(8)) could involve virtually any transfer not impermissibly affecting another party.

The Debtor has argued vigorously that the denial of confirmation of this plan would be contrary to law since the Bankruptcy Code permits a plan provision for the transfer of property to other entities.[17] While indeed there are statutory provisions that allow a plan to transfer property in satisfaction of debt, those provisions apply both to plans confirmed consensually as well as to plans confirmed by cramdown. The specific provisions of cramdown must be met if the requirements of § 1129(a)(8) for consensual confirmation are not met.

The most recent case on point is *In re Walat Farms, Inc.*[18] Judge Spector reaches many of the same conclusions that I do:

(1) If there can be any doubt about whether a creditor will realize full value, then the requirements of § 1129(b)(2)(A)(iii) are not met.

(2) When a fungible commodity trades in an established, liquid market, there is likely to be little doubt about its value and realization of that value; however, there. will generally be little, if any, § 1129(b)(2)(A)(iii) dispute about such value since the property can simply be sold and the creditor paid under the authority of

---

**15.** The legislative history of the Bankruptcy Code suggests that a plan may not be crammed down over a dissenting class if a senior class receives more than 100% of its claim: Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code", 53 A.B.L.J. 133, 142 (1979).

**16.** But see *In re Walat Farms, Inc.,* 70 B.R. 330 (Bkrtcy., E.D.Mich., 1987), footnote 7, which says that the Texas economy in fact rendered false the indubitable conclusion.

**17.** *See,* for example, 11 U.S.C. § 1123(a)(5) and (b)(5).

**18.** 70 B.R. 330 (Bkrtcy., E.D.Mich., 1987).

§ 1129(b)(2)(A)(ii). One should note the limitations of this conclusion to *fungible* commodities in *established, liquid* markets. If there is even a "little" doubt then the conclusion is not "indubitable."

(3) The payment of excess value to one creditor to assure indubitable equivalence in asset transfer plans is likely to be unfair to other creditors: "... a point is likely to come where the proponent would do violence to the 'fair and equitable standard' by paying Equitable more than its claim."[19]

## VI. In re Mural Holding Corporation[20]

In discussing "indubitable equivalence" it is *de rigueur* to cite *Murel Holding.* That case involves an apartment house appraised at $540,000. The first lien was about $20,000, for taxes; Metropolitan Life held the first mortgage for about $480,000. The plan called for the creditor to be paid in cash, with interest, a balloon payment due in ten years; the court held that a safety factor of 10% equity above the claim did not provide adequate protection of the creditor's right to receive the "indubitable equivalence" of his claim. Judge Hand made it clear that a speculative benefit to the creditor ($11,000 improvements to the building) "based upon the expectations of those who have everything to gain and nothing to lose"[21] was not enough to justify the stay of foreclosure involved in the plan. In this case, Sandy Ridge does not, and cannot for reasons explained elsewhere, propose even a 10% safety margin but asks the Court to conclude "indubitable equivalence" from findings of fact based on appraisal testimony alone. *Murel Holding* indicates that proof by a preponderance of the evidence based on appraisal testimony and financial projections is not enough even when there is a 10% safety factor; the conclusion must be indubitable.

## VII. The Debtor's Memorandum

Counsel for the Debtor has proposed variants of this plan in many cases and in most has submitted a memorandum for the proposition that a secured creditor may be forced to accept tangible property in satisfaction of its claim. In some of these memoranda counsel employs two steps in reasoning to his conclusion and supports the conclusion with citation of jurisprudence involving lien transfers followed by asset transfers; the two-step analysis is:

(1) Abandonment of collateral to a secured creditor is the realization by that creditor of the indubitable equivalence of his claim;

(2) Transfer of ownership of collateral to a lien creditor is superior treatment to abandonment of collateral to that creditor, and therefore, the secured creditor should be forced to accept such superior treatment.

A. *Abandonment of Collateral to a Secured Creditor Is the Realization By That Creditor of the Indubitable Equivalent of His Claim*

No one (at least in this case) disputes the proposition that abandonment of collateral to a secured creditor is the realization by that creditor of the indubitable equivalent of his secured claim. A respected Bankruptcy Judge said so.[22] Judge Learned Hand also said so.[23] Most important, the legislative history says so.[24]

But although one frequently hears the phrase "abandon to ... creditor", abandonment is not a judicial sale or transfer of

**19.** 70 B.R. 330, 335.

**20.** 75 F.2d 941 (2d Cir., 1935).

**21.** 75 F.2d 941, 942.

**22.** *In re Coral Petroleum, Inc.,* 60 B.R. 377 (Bkrtcy., S.D.Tex., 1986).

**23.** *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir., 1935).

**24.** "Abandonment of the collateral to the creditor would clearly satisfy indubitable equivalence, as would a lien on similar collateral." 124 Cong.Rec. H 11104, Sept. 28, 1975, S 17421, Oct. 6, 1978.

title.[25] The Debtor's brief essentially concedes that point.

This case, therefore, does not involve the simple issue of whether a plan of reorganization could be crammed down on a secured creditor if the plan provided that the property were simply to be abandoned. If the plan so provided, the creditor could foreclose under state law, and all parties concede that the creditor would have realized indubitable equivalence. Rather than simply provide for satisfaction of the secured claim by abandonment of the collateral, this Debtor insists that the creditor accept a transfer of the collateral in full satisfaction of his entire claim.

## B. *Transfer of Title Is Superior Treatment of a Creditor and Is Indubitably Equivalent to Abandonment*

Having established (the conceded point) that abandonment would meet the § 1129(b)(2)(A)(iii) requirements, the memorandum then contends that transfer of title of property to a creditor is more beneficial to the creditor than abandonment and, therefore, forced transfer is also sanctioned by the Code. The statement is baldly made, without cited authority; it may or may not be correct. The existence of this doubt has a profound effect on use of the transfer in cramdown of a plan.

First, absent some special feature of bankruptcy law, a transfer to a secured creditor in Louisiana is *subject to* all liens and encumbrances, even those otherwise inferior to the creditor receiving the transfer. While the Bankruptcy Code has provisions for selling property free and clear of liens, a plan provision, without more, is apparently not enough to avoid liens, at least absent some special notice to the parties whose liens are to be avoided and possibly an adversary hearing on that issue.[26] There was no showing in the case at

bar of the kind of notice and hearing or of the absence of liens that would support a conclusion that the property is free of liens. Therefore, it is not indubitable that a forced transfer to the creditor in this case is superior treatment to abandonment; that conclusion has not even been proved by a preponderance of the evidence.

Second, the transfer might bar the creditor from asserting deficiency rights against guarantors. The issue with regard to guarantors and endorsers is more complex than it might first appear because there are really two issues involved. First, there is the question of whether the guarantors, endorsers, or co-makers are released merely by the act of transfer provided for in the plan. Second, assuming that these guarantors are released *only to the extent* of payment received, there is the question of how to determine the amount that the creditor has been paid and hence the remaining liability, if any: *i.e.* whether the bankruptcy court's determination of transfer "in full payment" means that the value is conclusively established for future litigation by the creditor against the guarantors and endorsers. These issues are briefly considered, in turn, as follows:

Although La. CC Art. 3062 only extinguishes a guarantor's obligation if the creditor *voluntarily* receives a *dation en paiement*, the deficiency judgment act might still bar a judgment against the guarantor notwithstanding its amendment.[27] In a reply brief the Debtor cited substantial authority for the proposition that a judicial sale does not affect the liability of guarantors; counsel even attached copies of briefs of the issue on appeal in state courts. Counsel might well be correct regarding the legal issue strictly put: *i.e.* guarantors might not be released by such a sale. The important question in this case is whether that conclusion is indu-

---

**25.** "... abandonment constitutes a divestiture of all interests in property that were property of the estate. Although section 554 does not specify to whom property is abandoned, property may be abandoned to any party with a possessory interest in it ... Abandonment should not be considered a judicial sale of the property abandoned." 15 *Collier on Bankruptcy* 4, ¶ 554.02[2]. In Louisiana, a lienholder has no possessory

interest in collateral; abandonment does not transfer title in this state. *In re R–B–Co., Inc. of Bossier,* 59 B.R. 43 (Bkrtcy., W.D.La., 1986).

**26.** *In re Simmons,* 765 F.2d 547 (5th Cir., 1985).

**27.** La.R.S. 13:4108(3) only applies to *sales* by court order, not *dations en paiement.*

bitable. The mere existence of appellate briefs on the question indicates that the issue is dubitable.

The second and far more significant aspect of "guarantor/co-maker" liability is whether there is any *de facto* collateral estoppel effect of the payment accomplished by the plan. The question is best put by an example: if a plan calls for transfer of Blackacre to a creditor "in full payment" of a debt, is the debt truly paid in full? If not, then how much of the debt remains and what is the meaning of "transfer in full payment"? If "payment in full" really means what it says, then how can the creditor pursue the guarantors for a debt that has been paid? It is clear that confirmation of a plan normally discharges the debtor of debts satisfied by the plan;[28] it is also clear that discharge of the debtor does not affect guarantors.[29] Can the Debtor achieve by appraisal and by forced transfer "in full payment" a result that he could not achieve by discharge?

The difference between what the Debtor proposes to do by asset transfer and what would be accomplished by abandonment is also best explained by example. If the Debtor were to provide for the abandonment of Brightside to LNB, the plan could be crammed down on LNB as a secured class under § 1129(b)(2)(A)(iii) and the authority cited above.[30] The bankruptcy court could then determine the amount of the unsecured claim, if any,[31] and LNB could participate in additional distributions to the extent of its unsecured claim, if any. The liability of non-debtor guarantors, however, would not be affected by the bankruptcy proceeding as indeed it is not supposed to be.[32] If the asset is transferred under the plan in full satisfaction of the debt, however, the contract of guaranty might not be altered but the guaranty is extinguished (at least arguably) since the debt is judicially determined to be paid.

These questions are fascinating; the resolution of the legal principles can only be accomplished by Congress or the Supreme Court. Until then, the issue remains in doubt; so long as there is doubt, the conclusion is not indubitable.

### C. *Asset Payment Plans in the Jurisprudence*

The Debtor cites eleven cases for the proposition that the courts have confirmed asset payment plans by cramdown: *Upshaw, Adcock, Iverson,*[33] *Fursman Ranch,*[34] *Wieberg,*[35] *Elijah,*[36] *Griffiths,*[37] *Sloan,*[38] *Hollanger,*[39] *Tipps,*[40] and *Wise.*[41] The first two are unreported bankruptcy court opinions; I have no hint of their holding or the law upon which the court relied.

*Iverson* does not involve payment in property. It does involve substitution of liens. *Iverson* is very much like *Sun Country* in that the creditor is to be paid a sum certain in cash; the court holds that the creditor is adequately protected because the security for the obligation to pay is almost twice the amount to be paid. *Iverson* holds only that the promise to pay secured by one collateral is indubitably equivalent to the promise to pay secured by other collateral.

In *Griffiths* the plan was not confirmed. *Griffiths* discusses whether a § 1111(b)(2) electing creditor can be "cashed out" by a plan provision for "surrender" of part of

**28.** § 1141.

**29.** Section 524(e) provides that a discharge does not affect the liability of a guarantor.

**30.** See the discussion at footnote 24.

**31.** 11 U.S.C. § 506(a) and Bankruptcy Rule 3012.

**32.** 11 U.S.C. § 524(e).

**33.** 24 B.R. 227 (Bkrtcy., W.D.La., 1982).

**34.** 38 B.R. 907 (Bkrtcy., W.D.Mo., 1984).

**35.** 31 B.R. 782 (Bkrtcy., E.D.Mo., 1983).

**36.** 41 B.R. 348 (Bkrtcy., W.D.Mo., 1984).

**37.** 27 B.R. 873 (Bkrtcy., D.Kan., 1983).

**38.** 57 B.R. 91 (Bkrtcy., D.S.C., 1985).

**39.** 15 B.R. 35 (Bkrtcy., W.D.La., 1981).

**40.** 39 B.R. 149 (Bkrtcy., S.D.Ohio, 1984).

**41.** 34 B.R. 444 (Bkrtcy., W.D.La., 1983).

the collateral and payment in cash of the balance of the value of the collateral. The court held that such a plan cannot be confirmed over the secured creditor's dissent. Any statement supporting the payment of debts with tangible property must be *dicta.*

*Fursman Ranch* did indeed allow a credit against the debtor's obligation achieved by "surrender" of collateral. The decision is not as clear as one might hope. For one thing, it is not clear what "surrender" means in this context. However, it is abundantly clear that the transfer was indeed the indubitable equivalent of the creditor's claim because the secured creditors were to to sell the property in a "commercially reasonable transaction", and the debtors remained liable for any deficiency, regardless of the court valuation of the collateral.[42] Thus *Fursman Ranch* is either a § 1129(b)(2)(A)(ii) case or an "abandonment" case and not a *"dation"* or "deed in lieu" case.

In *Elijah* the debtor proposed "to surrender part of the property to the creditors to satisfy their secured positions in full." [43] It is unclear whether this "surrender" is an abandonment or a transfer of ownership. The debtor as well as the creditors apparently conceded that the creditors were oversecured. The court concluded (but apparently did not hold) that the debtor could cram down a plan that provided for "surrender" of part of the collateral in satisfaction of claims. As in *Fursman Ranch*, the debtor remained liable for the deficiency, and the creditor retained a secured claim against the remaining collateral "if a sale of the surrendered collateral does not pay the claims in full ..." [44] Thus the case seems to be a § 1129(b)(2)(A)(ii) case, not an (A)(iii) case. However, even these conclusions were apparently only tentative because the court did *not* confirm the plan but only allowed the debtor time to amend and stated:

"In addition, the Court notes that the whole proposal to surrender property in satisfaction of debt may be defective in that there is no provision for recapture of funds if the sale of property produces an excess over the present value of the claim of creditors." [45]

It appears that the court was directing the "surrender" of property to the creditor to permit a sale of property by the creditor and payment to the creditor in cash, with the creditor to refund any excess to the estate. This confirms the § 1129(b)(2)(A)(ii) characterization of the case.

All that *Wieberg held* is that a Chapter 11 plan does *not* meet the fair and equitable requirements for nonconsensual confirmation with respect to a secured creditor when the property to be transferred to the secured creditor, even valued by resolving all doubts in the Debtor's favor, is more than $300,000 less than the value of the secured claim. The plan in *Wieberg* was *not* confirmed and, as a result, the case was dismissed "for failure to confirm a plan and continued loss to the estate." *Sloan* and *Walat Farms* also deny confirmation of plans calling for forced transfer of land to lien creditors.

*Hollanger* is not authority for the cramdown of a plan on a secured creditor under § 1129(b)(2)(A)(iii) by payment in tangible property; there are several reasons for this conclusion:

(1) Of the seventeen classes of secured claims in *Hollanger*, sixteen (including *all substantial* secured claims) were to retain their liens and be paid in cash; this is (A)(i) treatment, not (A)(iii).

(2) The only secured creditor (of a total $5.5 million in secured debt) to be paid in tangible property was a creditor who held a lien on a bulldozer; presumably the claim was minimal when compared with other secured

---

**42.** "There is an additional safeguard here because this is an ongoing case. If a commercially reasonable sale by the creditors does not result in payment approximating the values set here, the creditors may ask for reconsideration of their claims." 38 B.R. 907, 910.

**43.** 41 B.R. 348, 349.

**44.** 41 B.R. 348, 352.

**45.** 41 B.R. 348, 352.

claims. The opinion does not say whether this creditor accepted the plan or not; thus, one cannot tell whether cramdown even applied to this creditor.

(3) The court apparently considered this a § 1129(b)(2)(A)(i) case and said so in its summary on page 47.[46]

(4) The opinion apparently considered "indubitable equivalence" in connection with § 1129(b)(2)(A)(i) and discusses it entirely in that context from pages 45–47.

*Tipps* held only that a plan is *not* fair and equitable to a secured creditor when it provides for the transfer of property to that creditor burdened with the obligation to develop that property; it is not a decision holding that the plan would be confirmed if the burden did not exist. Sandy Ridge argues otherwise. Even if Sandy Ridge were correct, the *Tipps* case is authority for *denial* of the Sandy Ridge plan. The Sandy Ridge appraisal is premised on the *development* of the property. Therefore, the value asserted by Sandy Ridge does not exist unless the creditor undertakes the burden of development. *Tipps* holds that such a burden causes the plan to fail the "fair and equitable" test.

*Wise* does not involve plan confirmation: § 1129. In the *Wise* case the plan had already been confirmed. More important, *Wise* does not involve cramdown: § 1129(b). In *Wise* the creditor had *accepted* the plan and the opinion simply involves enforcement of the provisions of a plan confirmed with the *consent* of the creditor.

## VIII. Supplemental Findings

■ This opinion has concentrated on the issue of whether a plan of reorganization can be confirmed by cramdown under § 1129(b)(2)(A)(iii) by the forced transfer to a secured creditor of tangible property involving highly imprecise valuation under circumstances in which there is not suffi-

cient margin for valuation error to permit the conclusion that the secured creditor will indubitably realize the equivalent of his claim. In summary, I conclude that the appraisal testimony in this case was (and is always likely to be) "dubitable" and, therefore, transfer in satisfaction of a claim, as opposed to mere abandonment, is not the realization of indubitable equivalence. Therefore, I conclude that the requirements of § 1129(b)(2)(A) are not met regarding Classes 3 and 4 of the plan in this case.

For the following additional reasons, I conclude that the plan in this case cannot be confirmed.

(1) The plan does not meet the requirements of § 1129(a)(1) because it has as a principal objective, by appraisal and transfer of property, an effect that is prohibited by 11 U.S.C. § 524(e), the discharge of non-debtor guarantors. The analysis is set forth in more detail in paragraph 5 below.

(2) The value of Brightside is about $1.7 million and declining and, therefore, LNB will not realize the indubitable equivalent of its claim. There was conflicting valuation testimony about Brightside. While Dr. Aguilar provided a very sophisticated valuation model, I find the underlying assumptions of market demand for the hypothetical development to be unconvincing, for reasons stated by Messrs. Bahlinger and Pugh. I therefore conclude that the value of Brightside is $1.7 million or less. I accept as very convincing the testimony of Messrs. Pugh and Bahlinger that real estate values are declining at an unknown rate but approximately 6–10% per year. No matter *what* valuation I establish for the property, LNB will not *realize* that value since the value is constantly declining.

(3) The plan is not feasible because it is completely unworkable. The principal dif-

---

**46.** "... [T]he Debtors' plans provide generally that all secured creditors will be paid after confirmation ... Thus, creditors will be receiving deferred cash payments totalling (sic) at least the amount of their debts ... and retaining their lien in the collateral for the full amount of their debts which are secured, all within Section

1129(b)(2)(A)(i)." 15 B.R. 35, 47. Since the Bulldozer Creditor is not even mentioned, the court either forgot about his treatment under § 1129(b)(2)(A)(iii) or he might have accepted the plan and thus not have been covered under § 1129(b) at all.

ficulty lies with the Port Vincent property. The plan provides for the transfer of some unspecified portion of Port Vincent to Livingston Bank, for the transfer of some unspecified portion of Port Vincent to LNB, for the sale of some unspecified portion of Port Vincent to pay taxes (and presumably Class 1 claimants). There is no way to tell whether LNB and Livingston Bank will receive the indubitable equivalents of their claims because there is no way to tell exactly what they will get. Because real estate is involved, it is simply unthinkable that a portion can be carved out that will be worth *exactly* the amount of the secured claim. Moreover, there is no procedure in the plan for making that determination. The Debtor apparently assumes that all portions of the tract (front, rear, road frontage, *etc.*) have equal proportionate value and a fractional part can simply be "carved out" after valuation of the whole. The evidence does not support that concept. Alternatively, the Debtor may intend to transfer to the creditors a percentage interest in the whole tract. There is no evidence that the value of a fractional interest is directly proportional to its relation to 100%. Therefore, it is likely that LNB will be either overpaid or underpaid. Either result would result in denial of plan confirmation.

(4) If either LNB or Livingston Bank is overpaid, then the plan is not fair and equitable to Class 6 unsecured creditors under the implicit "fair and equitable" criteria discussed above which holds that a plan that overpays a senior class is not fair and equitable to a junior class.[47] In addition, the plan does not meet the explicit "fair and equitable" criteria for Class 6 (unsecured creditors), who rejected the plan because the Debtor does not propose to pay that class 100% of the present value of their allowed claims. While the plan nominally provides that the only class inferior to Class 6 (*i.e.* Class 7 equity interest holders) will surrender their interests and retain nothing, the nominal provision does not obtain in fact. The equity interest holders will apparently retain control of the corporation to determine how Port Vincent will be divided, transferred, and sold; the equity interest holders will apparently retain control to direct litigation of the lender liability claim against LNB. These management rights are retained rights of the stock and thus neither the provisions of § 1129(a)(8) nor the provisions of § 1129(b)(2)(B) are met as to Class 6.

(5) I conclude that the plan was not filed in good faith; it therefore does not meet the requirements of § 1129(a)(3). Counsel for the Debtor has devoted substantial energy to the proposition that use of cramdown does not constitute bad faith. That proposition is correct and is not really subject to debate.[48] Nevertheless, good faith is an element that the proponent of every plan must prove when challenged. The purpose to be served by the plan provisions that call for transfer of property to secured creditors could be served merely by abandonment of the collateral to those creditors, with less litigation and greater certainty. The abandonment would satisfy the secured claimant to the extent of the secured claim; any additional claim held by that claimant would be an unsecured claim subject to consensual confirmation or cramdown under § 1129(b)(2)(B). LNB contends that the purpose of drafting this plan to provide for a transfer of property rather than an abandonment of property has the purpose of affecting the liability of non-debtor guarantors; the Debtor denies this in some pleadings and admits it in others. Since the Debtor is equivocal, since the Debtor has offered no reason for the plan structure except a bald assertion that this is the Debtor's "right" under the Bankruptcy Code, and since simple logic supports LNB's assertion, I conclude that the plan is not proposed in good faith because the Debtor has confected its plan in disregard of its own interests and with the principal purpose not to reorganize the Debtor but to eliminate the legal liability of non-debtor insider guarantors. I conclude that this was an improper use of the bankruptcy

47. See the discussion at footnote 15 above.

48. *In re Sun Country Development, Inc.,* 764 F.2d 406 (5th Cir., 1985).

laws under the Bankruptcy Act which is intended by § 1129(a)(3) to preclude plan confirmation.[49] I thus conclude that the plan was not proposed in good faith because it was not proposed with the legitimate and honest purpose to reorganize but to affect legal relationships between third parties.

I thus conclude that the plan in this case should not be confirmed because it does not meet the requirements of § 1129(a)(1), (3), (7), and (8) and that the plan does not meet the requirements of § 1129(b).

For these reasons, a separate order was entered denying confirmation.

**49.** See the authority and analysis: *Collier on Bankruptcy,* 15th Ed., ¶ 1129.02[3].