In the Matter of SANDY RIDGE DE-
VELOPMENT CORPORATION,
Debtor.

SANDY RIDGE DEVELOPMENT
CORPORATION, Appellant,

v.

LOUISIANA NATIONAL
BANK, Appellee.

No. 88–3072.

United States Court of Appeals,
Fifth Circuit.

Sept. 5, 1989.

John C. Anderson, Jack Patrick Harris, Baton Rouge, La., for appellant.

Fredrick R. Tulley, Joseph R. Martin, Baton Rouge, La., John R. Tharp, Fredrick R. Tulley, Baton Rouge, La., for La. Nat. Bank.

James R. Austin, Stacy E. Grove, Baton Rouge, La., for Livingston Bank.

Michael Harig, Baton Rouge, La., for Evans Graves Engineers, Inc.

Ralph Hood, Baton Rouge, La., for Contractors, Inc.

Before WISDOM, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Debtor-appellant Sandy Ridge Development Corporation (Sandy Ridge) appeals the district court's affirmance of the bankruptcy court's rejection of its Chapter 11 reorganization plan. We reverse and remand.

**Facts and Proceedings Below**

Sandy Ridge was formed in 1982 by John C. Wiese (Wiese) and John B. Hamilton (Hamilton) for the purpose of developing commercial and residential real estate in the vicinity of Baton Rouge, Louisiana. Wiese and Hamilton jointly managed the corporation as fifty-percent shareholders. During 1983–84, Sandy Ridge acquired two properties, a 31.30–acre tract known as "Brightside," and a 47.60–acre tract known as "Port Vincent," both with a view to future subdivision development. Sandy Ridge financed the Brightside acquisition through a loan from Louisiana National Bank (LNB), secured by a first mortgage on the property. At the time of bankruptcy, Sandy Ridge owed LNB approximately $2.4 million on the Brightside loan. Wiese and Hamilton also signed guaranty agreements in which they became personally liable for up to $2.1 million of this LNB debt. Wiese's father, H.E. Wiese, guaranteed the remaining $300,000.

The Port Vincent transaction was more complex. Sandy Ridge purchased a number of smaller tracts and consolidated them into the Port Vincent development. Financing for these acquisitions consisted primarily of a loan from Livingston Bank (Livingston), which held a second mortgage on the property.[1] LNB held a lien on Port Vincent as well, but this lien was subordinate to Livingston's. At the time of bankruptcy, Sandy Ridge owed Livingston approximately $560,000 on its Port Vincent loan and owed LNB an additional $100,000 in respect to Port Vincent. However, un-

---

1. The first lien on Port Vincent was held by Clay V. Richards (sometimes spelled "Richard"). Richards was an owner of one of the small tracts purchased by Sandy Ridge and consolidated into the Port Vincent development. At the time of its bankruptcy petition, Sandy Ridge owed Richards $2,500.

like Brightside, the Port Vincent transaction did not involve personal guarantees.

By 1986, Sandy Ridge's financial condition had deteriorated. On January 31, 1986, Wiese (allegedly without Hamilton's knowledge) filed a petition under Chapter 11 of the Bankruptcy Code for Sandy Ridge. On February 13, 1986, Hamilton moved to dismiss the petition since he, as a fifty-percent shareholder, had not approved.[2] The bankruptcy court granted this motion on February 26. In the meantime, on February 20, 1986, LNB had filed suit against Wiese, Hamilton, and Wiese's father on the basis of the continuing guaranty agreements on the Brightside loan. Hamilton then reconsidered his opposition to bankruptcy, and on March 7, 1986, Sandy Ridge filed its current Chapter 11 petition. On March 12, 1986, Sandy Ridge filed its disclosure statement and plan of reorganization. This statement listed two major assets, the Brightside and Port Vincent properties. The statement also listed approximately $138,000 of sewer equipment, as well as one speculative asset, a pending lender liability lawsuit against LNB.[3] The listing of assets and related liens may be summarized as follows:

| Property | Lien Amount | Lienholder | Rank | Appraised FMV[4] |
|---|---|---|---|---|
| Brightside | $2,400,000 | LNB | 1 | $1,100,000 to 2,400,000 |
| Port Vincent | 2,500 | C. Richards | 1 | 260,000 to 1,100,000 |
| | 560,000 | Livingston | 2 | |
| | 100,000 | LNB | 3 | |
| Sewer equipment | none | none | – | 138,000 |
| Pending suit | none | none | – | Unknown |

Sandy Ridge's plan of reorganization was in substance a liquidation. The plan named seven classes of creditors:

| Creditor | Amount Owed |
|---|---|
| Administrative costs | $ Unknown |
| Taxes | 10,000 |
| LNB ($2,400,000 plus $100,000) | 2,500,000 |
| Livingston | 560,000 |
| Richards | 2,500 |
| Unsecured creditors | 672,000 |
| Wiese and Hamilton (as shareholders) | –0– |
| Total | $3,744,500 |

The plan provided that:

1. Sandy Ridge would transfer Brightside to LNB for "a credit on the indebtedness *to the extent of* the fair market value of [the Brightside property]" (emphasis added).[5]

2. In the event that the above failed to cover the debt owed LNB, Sandy Ridge would transfer up to $100,000

2. Hamilton stated in his dismissal motion that Wiese filed the petition primarily to protect his father, who had guaranteed up to $300,000 of the Brightside debt.

3. Wiese and Hamilton filed that lawsuit against LNB alleging that LNB had refused to provide additional funds for development of the property. This suit, originally filed in the United States District Court for the Middle District of Louisiana, was remanded to state court (the 19th Judicial District Court in Baton Rouge, Louisiana), where it is currently pending.

4. The low-end appraisals were those of LNB and Livingston. Sandy Ridge's appraisers produced the higher figure.

5. This provision of the plan is emphasized only because of confusion below, due to the perception that the plan provided for the transfer of Brightside to satisfy LNB's *full* claim. While this would occur if the court accepted LNB's appraised value ($2.4 million) as an accurate value of Brightside, the court did not do so. The plan never provided that the transfer would satisfy LNB's entire claim, but instead stated that it would only satisfy LNB's *secured* claim.

worth of Port Vincent property (that portion subject to LNB's second mortgage) to LNB to make up for the shortfall.

3. Sandy Ridge would transfer "sufficient property from [Port Vincent] ... in full satisfaction of the indebtedness" to Livingston ($560,000).

4. The remaining property would be sold and the proceeds (along with any judgment proceeds from the lender liability suit against LNB) would be distributed to the holders of unsecured claims.

Of the creditors empowered to vote, only two classes, Class 2 (tax claims) and Class 5 (Richards) voted to accept the plan.[6] However, these creditors were owed only $12,500 of the total $3.74 million claim. In terms of dollar value, 99.67 percent of the creditors voted to reject the plan. Sandy Ridge then attempted a cramdown under 11 U.S.C. § 1129(b). However, the bankruptcy court refused to confirm the plan. The court provided several reasons for its decision. First and foremost, the court held that Sandy Ridge failed to satisfy the requirements of section 1129(b)(2)(A)(iii) of the Bankruptcy Code, 11 U.S.C. § 1129(b)(2)(A)(iii), which requires that secured creditors realize the indubitable equivalent of their claims. The court also found the plan was not a feasible reorganization, but rather that the principal objective of the plan was the discharge of nondebtor guarantors. The court concluded that the plan was not workable because of its failure to specify how Port Vincent would be divided, that the plan was not filed in good faith,—and that the plan was unfair to unsecured creditors. *In re Sandy Ridge Development Corp.*, 77 B.R. 69, 79–81 (Bankr.M.D.La.1987).

## Discussion

### I. Sandy Ridge's Plan under the Bankruptcy Code [7]

To begin, we must first clear a misconception that permeates the bankruptcy

court's opinion. The bankruptcy court appears to have concluded that the plan proposes to transfer Brightside to LNB in full satisfaction of LNB's *entire* claim. However, this is not the case. The plan provides that the transfer of Brightside will only provide "for a credit on the indebtedness to the extent of the value of Brightside." This now being clear, we examine the application of the Code to this plan.

### A. Treatment of Undersecured Creditors

Unless one accepts Sandy Ridge's appraisal of Brightside at face value, LNB is a classic example of an undersecured creditor; one whose collateral is insufficient to cover the entire debt. Section 506(a) of the Bankruptcy Code bifurcates an undersecured creditor's total claim into secured and unsecured portions.[8] The Code's treatment of such creditors is determined not from the status of the party as a secured or unsecured *creditor*, but rather from the status of a claim as a secured or unsecured *claim*. H.Rep. 95–595 at 180, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5963 at 6141. In situations involving only one creditor and one debtor, the value of the undersecured creditor's secured claim is simply the value of the underlying collateral. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). The difference between the collateral's value and the amount of the debt becomes an unsecured claim and is added to the existing pool of unsecured claims. In the present case, LNB's secured claim is equal to the value of Brightside, and for the present analysis, the exact value of Brightside is unimportant.[9]

### B. Indubitable Equivalence

Section 1129(b), the Code's cramdown provision, requires that a plan be "fair and equitable" in order to confirm the

---

6. As to the status of Richards and the tax claims, *see* part II, *infra.*

7. Most of our discussion will revolve around the Brightside tract. Port Vincent enters the picture primarily regarding the issue of the plan's feasibility.

8. Section 506(a) of the Code states in pertinent part that

"[a]n allowed claim of a creditor secured by a lien on property ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...."

9. For instance, given a $2.4 million total debt, if Brightside is worth $1.7 million, then LNB's secured claim is $1.7 million and the remaining $700,000 becomes an unsecured claim.

plan over a dissenting class of creditors. Section 1129(b)(2) provides:

"For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

"(A) With respect to a class of secured claims, the plan provides—

" . . . .

"(iii) for the realization by such holders of the indubitable equivalent of such claims."[10]

This "indubitable equivalent" language is at the heart of the current case, and fortunately its application is relatively straightforward. The key determination is the precise meaning of the phrase "such claims," and our inquiry concludes that "such claims" can only mean *secured* claims. Section 1129(b)(2) is divided into several subsections. Section 1129(b)(2)(A) deals with secured claims, while section 1129(b)(2)(B) deals with unsecured claims. Since the "indubitable equivalent" language is part of section 1129(b)(2)(A), it deals only with secured claims, and thus section 1129(b)(2)(A)(iii) can be accurately read to state "the realization of the holders of secured claims of the indubitable equivalent of their *secured* claims." Since the value of LNB's secured claim is equal to the value of Brightside, a plan which provides that LNB will realize the indubitable equivalent of Brightside will satisfy the requirements of section 1129(b)(2)(A)(iii). The current plan provides that LNB will receive Brightside itself, and since common sense tells us that property is the indubitable equivalent of itself, this portion of the current plan satisfies the "indubitable equivalent" requirement.[11]

Furthermore, this result accords with the development of the term "indubitable equivalence." It is settled that the concept of indubitable equivalence is rooted in the language of *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935). *See* 124 Cong. Rec. H 11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Admin.News 6436 at 6475. In *Murel*, the court stated that "a creditor who fears the safety of his principal will scarcely be content with ... [interest payments alone]; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that ... unless by a *substitute* of the most indubitable equivalence." *Murel*, 75 F.2d at 942 (emphasis added).

The key word is "substitute." In *Murel*, the reorganization plan proposed to pay the secured creditor interest on the collateral for ten years, with full payment of the principal due at the end of that time. However, the plan made no provision for amortization of principal or for maintenance of the collateral (an apartment building) over the ten-year term. *Id.* The court refused to confirm this "wholly speculative" plan, since the creditor would receive *neither* money nor property, nor would he receive an equivalent substitute. *Id.*[12] In the present case, LNB will receive the actual property underlying its secured claim and, therefore, it is clear that it will receive the indubitable equivalent of its secured claim.

### C. Release of Nondebtor Guarantors

■ The bankruptcy court also expressed concern that LNB's acceptance of the Brightside tract, even under an involuntary cramdown, would release the third-party guarantors (Hamilton, Wiese, and Wiese's father) from liability, although the plan makes no express provision for (or

---

**10.** Sections 1129(b)(2)(A)(i) and (ii) are not relevant to the instant appeal.

**11.** The fact that property values are declining is irrelevant. At any given moment in time, LNB's secured claim is equal to the value of Brightside at that time. Several recent cases have cited *Sandy Ridge* for the conclusion that a transfer of property satisfies the "indubitable equivalent"

standard only if that property is the equivalent of cash. *E.g., In re Future Energy Corp.*, 83 B.R. 470, 495 (Bankr.S.D. Ohio 1988) This is incorrect.

**12.** *Murel* stands in contrast to the situation in *In re Sun Country Development, Inc.*, 764 F.2d 406 (5th Cir.1985), where we affirmed a finding of indubitable equivalence.

reference to) such a release. This perceived problem was a major underpinning to the court's finding of bad faith, for the bankruptcy court concluded that this was the major motivation behind Sandy Ridge's Chapter 11 petition. *Sandy Ridge,* 77 B.R. at 81. However, analysis of both the Bankruptcy Code and Louisiana law indicates that this concern is unfounded, and that whatever the motives underlying Sandy Ridge's petition, it simply cannot operate to release the nondebtor guarantors of the Brightside loan. Section 524(e) of the Bankruptcy Code provides, with a minor exception, that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." A discharge in bankruptcy will simply not affect the liability of a guarantor. *R.I.D.C. Industrial Development Fund v. Snyder,* 539 F.2d 487, 491 (5th Cir.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977). *See also Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985); *In re Scranes, Inc.,* 67 B.R. 985, 989 (Bankr.N.D. Ohio 1986). *But see Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987) (*res judicata* effect of order approving plan which expressly provides for release of third-party guarantor who was also a creditor).

■ Although the Bankruptcy Code cannot operate to release nondebtor guarantors, there exists the additional concern that a transfer of Brightside to LNB could operate as a *dation en paiement* ("giving in payment") under Louisiana law, thereby discharging the guarantors' obligations. However, a review of Louisiana law reveals that this concern is also unfounded. Article 2655, La. Civ.Code Ann., states that "[t]he giving in payment is an act by which a debtor gives a thing to a creditor, *who is*

*willing to receive it,* in payment of a sum which is due." (Emphasis added.) A *dation en paiement* requires the consent of the parties. *Fruehauf Trailer Division, Fruehauf Corp. v. Toups,* 243 So.2d 88, 91 (La.App.1970). This consent is not obtained by a discharge of the debtor in bankruptcy. A bankruptcy discharge arises by operation of federal bankruptcy law, not by contractual consent of creditors, and "[a] creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings." *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982); *In re Kornbluth,* 65 F.2d 400, 402 (2d Cir.1933). "When a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors." *Underhill v. Royal,* 769 F.2d at 1432. If a creditor's approval of the plan is not consent, then it is even more clear that a creditor's *rejection* of the plan cannot be deemed consent. Furthermore, if the property is sold, and the proceeds distributed to LNB, La. Rev. Stat. Ann. § 13:4108(3) provides that a sale pursuant to an order of a United States bankruptcy court may not prohibit a creditor from obtaining a deficiency judgment against any debtor, guarantor, or surety. Although this provision was adopted after the filing of the current petition, this Court, in *General Electric Credit Corp. v. Guillory & Son Mobile Home Sales, Inc.,* 822 F.2d 545 (5th Cir.1987), found that the statute was conclusive of the Louisiana legislature's intent to exempt bankruptcy sales from Louisiana's Deficiency Judgment Act requirements, and that the statute merely codified the Louisiana Supreme Court's decision in *Exchange National Bank of Chicago v. Spalitta,* 321 So.2d 338, 341–42 (La.1975), *cert. denied sub nom. Henican v. Exchange National Bank,* 425 U.S. 904, 96 S.Ct. 1494, 47 L.Ed.2d 753 (1976). *General Electric,* 822 F.2d at 547.[13] Although the

---

13. Section 13:4108.1, La. Rev. Stat. Ann., expressly provides that "if a mortgagee or other creditor holds a mortgage ... which secures an obligation in a commercial transaction, the mortgagee or other creditor may collect from or pursue any ... guarantor ... for a deficiency judgment on the secured obligation ... whether or not the mortgagee or other creditor has ... acquired such property from any debtor, guarantor, or surety pursuant to a complete or partial dation en paiement." This statute was enacted in 1986, after the current petition, but it, like section 13:4108(3), reflects the codification of previously recognized principles.

statute is new, the underlying legal principles are long standing and well established. Confirmation of Sandy Ridge's plan would not release Hamilton, Wiese, or Wiese's father from their guaranty obligations.

### D. Propriety of Liquidating Reorganizations

■ One other concern of the bankruptcy court was that the plan's primary purpose did not appear to be .an effort to reorganize Sandy Ridge as a viable economic entity, and thus ran counter to the overall scheme of Chapter 11. It is true that barring a windfall from its lender liability suit against LNB, the plan, if carried out, would leave Sandy Ridge as an empty shell, with no assets of any type, ánd that on its face Sandy Ridge's plan appears to belong in Chapter 7 rather than Chapter 11. However, our research persuades us that in the Bankruptcy Code Congress did contemplate liquidating reorganizations. Section 1129(a)(11) states that one requirement for a plan is that

"[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, *unless* such liquidation or reorganization is proposed in the plan." (Emphasis added.)

Section 1123(a)(5) states that a plan shall "provide adequate means for the plan's execution, such as—

 ". . . .

 "(D) sale of all or any part of the property of the estate, either subject to or free of any lien, *or* the distribution of all or any part of the property of the estate among those having an interest in such property of the estate; . . . ." (Emphasis added.)

Section 1123(b)(4) states that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests . . . ."

It is clear from these statutory provisions that although Chapter 11 is titled "Reorga-nization," a plan may result in the liquidation of the debtor. *In re Coastal Equities, Inc.*, 33 B.R. 898, 904 (Bankr.S.D. Cal. 1983). *See* H.Rep. 95–595 at 407, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963 at 6363. Furthermore, even though section 1123(b)(4) refers to "sale of all . . . property," it appears that a plan may include a "give-back" such as that proposed in the current case. Section 1123(a)(5) allows the "distribution of all or any part of the property of the estate" to creditors. 5 *Collier on Bankruptcy* at 1123–20 states that section 1123(b)(4) merely *supplements* section 1123(a)(5)(D). It appears that the distribution of property to creditors under a liquidating plan of reorganization is not *per se* improper under the Code.

### II. Problem Areas

■ However, although such a distribution is, as a general rule, not *per se* impermissible under the Code, this does not necessarily mean that every plan proposing such a distribution should be confirmed. Instead, the bankruptcy court "must consider the entire plan in the context of . . . the particular facts and circumstances [of the case]." *In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989). To begin with, simple technical compliance with the requirements of section 1129(b)(2) does not assure that the plan is fair and equitable. *Id.* Instead, this section merely sets minimal standards that a plan must meet, and does not require that "every plan not prohibited be approved." *Id.* Second, even if a plan is "fair and equitable," it must continue to meet all of the requirements of section 1129(a) (with the exception of paragraph (a)(8)). The bankruptcy court found that Sandy Ridge's plan does not fulfill these requirements. While we do not completely agree with the court's reasoning, we share the bankruptcy court's concern for the workability of the plan and for Sandy Ridge's apparent lack of good faith.

■ Regarding workability, section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." For

instance, a plan providing for future cash payments must specify the amount of payments to be made and the date when such payments will be due. 5 *Collier on Bankruptcy* at 1123–7. If a plan proposes to convert debt to equity, the terms of this conversion must be described in detail. *Id.* In the current case, the plan is completely devoid of specificity as to the division of Port Vincent. It is unclear whether each creditor will receive a portion of the property or an undivided fractional interest. The plan apparently assumes that "all portions of the tract ... have equal proportionate value and [that] a fractional part can simply be 'carved out' after valuation of the whole" *Sandy Ridge*, 77 B.R. at 80. However, the bankruptcy court found that "the evidence does not support that concept," since the value of parts of Port Vincent depends upon factors such as road frontage. We see no clear error in this finding.[14]

█ We also share the bankruptcy court's concern with Sandy Ridge's apparent lack of good faith. Although we disagree with the court's conclusion that the plan was calculated to protect nondebtor guarantors (since it could not do so regardless of the debtor's intent), we note that good faith is to be determined by the totality of the circumstances. *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1160 (5th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988); *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir.1984). We are especially concerned with the classification of the tax claims (Class 2) and Richards (Class 5) as "impaired." In order to complete a cramdown, section 1129(a)(10) re-

quires that at least one class of impaired creditors accept the plan. Given the fact that the creditors overwhelmingly rejected the plan, it appears that the plan deemed the tax creditors and Richards to be impaired for the sole purpose of having their votes in favor of the plan fulfill this requirement. Regarding the tax claims, we can discern no reason why these claims are impaired other than the plan's bald statement that "[t]his class ... will be deemed impaired." [15] Regarding Richards, the plan proposes that Richards will be paid the full amount of his claim ($2,500) "from property not of the estate, but to be paid by an individual, within thirty (30) days following" confirmation of the plan. This plan, on its face, *may appear* to leave Richards *technically* impaired.[16] However, Richards holds a *first* priority lien on Port Vincent higher than that of either Livingston or LNB, and it is undisputed that Port Vincent is worth vastly more than Richards' $2,500 claim. Furthermore, the plan does not identify the individual who is to pay Richards, nor does it state whether that individual will be subrogated to his claim. On remand, the bankruptcy court should consider this issue in light, *inter alia*, of the requirement of good faith.

### III. The Valuation Issue

In the above discussion, we have treated the specific value of Brightside as irrelevant. However, it may become important, since the bankruptcy court may have to determine the precise value of LNB's unsecured claim. This valuation matter appears to be the focal point of LNB's objec-

---

**14.** Bankruptcy Rule 8013 states in part that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." *In re HECI Exploration Co. v. Holloway*, 862 F.2d 513, 518 (5th Cir.1988); *In re Missionary Baptist Foundation of America, Inc.*, 818 F.2d 1135, 1142 (5th Cir. 1987).

**15.** Tax claims are priority claims (11 U.S.C. § 507(a)(7)) and, in light of this priority status, a review of the record indicates that this tax claim will be paid in full under any possible scenario.

**16.** Section 1124 provides in pertinent part that a plan leaves a claim impaired *unless* it "(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest" or "(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—(A) with respect to a claim, the allowed amount of such claim...."

tion to the plan. The bankruptcy court found that Brightside was worth approximately $1.7 million, and that its value was declining at approximately six to ten percent per year. *Sandy Ridge*, 77 B.R. at 79. Since by definition LNB's secured claim equals the value of Brightside, the plan would leave LNB with an unsecured claim of $700,000. LNB would then be able to pursue the guarantors for this sum. However, under Louisiana foreclosure law, LNB could bid in at two-thirds the appraised value of Brightside.[17] Assuming, *arguendo*, that this appraisal value is also $1.7 million, then under the Louisiana procedure, LNB could bid in at foreclosure $1.13 million, possibly be able to buy the property at that price (in many foreclosures, the creditor is the only bidder), and hold the guarantors accountable for the shortfall.[18] Since such a turn of events would result in an unsecured claim of $1.27 million rather than $700,000, it is plain why LNB might prefer this approach.

 However, we must reject LNB's argument that the bankruptcy court cannot set the value of property but instead must in all instances require the debtor to abandon that property and let the foreclosure sale market determine its price.[19] This is simply not required by the Code. Section 506(a) provides that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of the property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." It seems contemplated that this determination is to be made by the court.[20] Furthermore, we have recently held that "[t]he valuation of the assets of a debtor in bankruptcy ... is an integral part of the confirmation process under Chapter 11." *Texas Extrusion*, 844 F.2d at 1165. LNB contends that the abandonment/foreclosure route is necessary to protect its interests in the face of a declining real estate market, since by bidding in at two-thirds of the current appraised market value it will be protected from some of the decline. While LNB has valid concerns regarding such market conditions, it is clear that these market factors must be taken into account by the bankruptcy court when valuing collateral. 3 *Collier on Bankruptcy* at 506-25. Although we recognize that property valuation is not an exact science, it remains an integral part of the bankruptcy process.

### Conclusion

In conclusion, we hold that the transfer on plan approval of all its collateral to a secured creditor, at a value properly fixed by the bankruptcy court, gives that creditor the indubitable equivalent of its secured claim. We therefore reverse the district

---

17. Under Section 13:4363(A), La.Rev.Stat.Ann., the debtor and the creditor each appoint an appraiser to fix the value of property subject to judicial foreclosure sale. If these appraisers do not agree (and are more than ten percent apart, up to $250,000), then the sheriff appoints a third appraiser whose decision is final. La.Rev.Stat. Ann. § 13:4365(B). Once the property's value has been fixed by the appraisal, the creditor may bid at two-thirds the appraised value. La. Code Civ.Proc.Ann. art. 2336 (West 1961).

18. Of course, the guarantors, if they had (or could acquire) the funds to do so, could bid in the appraised value at the foreclosure sale, and protect themselves in that fashion.

19. It is not clear to us why LNB did not simply move to request relief from the automatic stay if its primary concern was receiving the "cushion" it would have if it were able to foreclose on the Brightside property and bid on the property at two-thirds of its appraised value. Section 362(d) provides that the bankruptcy court *shall* grant relief from the stay if (a) the debtor does not have an equity in such property, and (b) such property is not necessary for an effective reorganization. In the present case, Sandy Ridge concedes that it has no equity in Brightside. Furthermore, since the plan is a liquidating plan, the property is not necessary for an effective reorganization, since there is no evidence that the property would bring a greater price if liquidated with other property as a unified whole. *See, e.g., In re 6200 Ridge, Inc.,* 69 B.R. 837, 844 (Bankr.E.D.Pa.1987).

20. Bankruptcy Rule 3012 states that "[t]he court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct."

court's affirmance of the bankruptcy court's decision to the contrary. It appears that the rejection of the plan may have been substantially influenced by certain of the bankruptcy court's erroneous legal conclusions. However, we share the bankruptcy court's concern with the workability of the plan and with Sandy Ridge's apparent lack of good faith. We therefore remand the matter to the bankruptcy court for reconsideration (and such further findings, if any, as may be appropriate) of the plan consistent with this opinion.

The case is accordingly remanded to the bankruptcy court.

REVERSED and REMANDED.