WILLIAM A. NORRIS, Circuit Judge:
Debtor Arnold and Baker Farms petitioned for relief under Chapter 11 and filed a plan of reorganization which proposed to satisfy the claims of the creditors by transferring real property to them — colloquially known as a “dirt for debt” plan. When Arnold and Baker’s largest creditor, the Farmers Home Administration (FmHA), objected to the plan, Arnold and Baker invoked the “cram down” provision of the Bankruptcy Code, 11 U.S.C. § 1129(b). The question presented is whether the plan’s proposal to transfer to FmHA a portion of the collateral securing FmHA’s claim will provide FmHA with the “indubitable equivalent” of its secured claim, as required by the “cram down” provision. See 11 U.S.C. § 1129(b)(2)(A)(iii).
I
We adopt and quote verbatim the statement of facts set forth by the Bankruptcy Appellate Panel at United States v. Arnold and Baker Farms (In re Arnold and Baker Farms), 177 B.R. 648, 652-53 (9th Cir. BAP 1994):
The debtor Arnold and Baker Farms is an Arizona general partnership. The partnership was formed ... for the purpose of farming and the sale and lease of farmland. Arnold and Baker purchased 1120 acres from Philip and Dorothy Ladra in 1975 and an additional 320 acres in 1979. *1418 The Ladras were given a first deed of trust on the property. In 1977, the farm began to experience financial difficulties.
[FmHA] and Western Cotton Services Corporation, a wholly owned subsidiary of Anderson Clayton Company, financed certain crops for the years 1978 through 1981. Additionally, FmHA lent Arnold and Baker sufficient funds to make the annual payments on the installments due to the Ladras in the years 1979, 1980, and 1983. In return, FmHA held a second deed of trust on Arnold and Baker’s real property____ Western Cotton held a third deed of trust on Arnold and Baker’s real property-
The Ladras ultimately instituted a judicial foreclosure proceeding against Arnold and Baker’s real property. Subsequently, in April 1984, the Bakers individually filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Ladras obtained relief from the automatic stay and continued their judicial foreclosure proceedings. Arnold and Baker, the partnership, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in April 1986.
In May 1986, the bankruptcy court approved the sale of two pieces of real property free and clear of liens: 360 acres of real property to Cardón Oil Company and 480 acres to the entity known as the Corks. From the net proceeds of the sale and the payment of annual installments, Arnold and Baker satisfied the secured claim of the Ladras in the amount of $1,650,000. FmHA thereafter held a first priority and Western Cotton held a second priority lien in the property.
Arnold and Baker subsequently formulated two plans based on the income generated from the Cardón and Cork sales which proposed to pay in full the allowed claims of all creditors. The first plan was withdrawn when the Corks defaulted on their note and the other, a revised plan, was withdrawn when Cardón Oil defaulted on its note. With respect to the Corks’ default, Arnold and Baker negotiated a settlement pursuant to which the Corks tendered 360 acres to Arnold and Baker in lieu of foreclosure [footnote omitted]. With respect to the Cardón default, Arnold and Baker ultimately purchased the 320 acre parcel at a nonjudicial foreclosure [footnote omitted].
In January 1991, Arnold and Baker filed a second amended plan and disclosure statement. The second amended plan proposed to pay FmHA’s $3,837,618 note and Western Cotton’s $565,044 note in full. The plan proposed to transfer a proportionate fee simple interest in the 635 acre parcel of real property to FmHA and Western Cotton. FmHA was earmarked to receive 515 acres of real property and Western Cotton was earmarked to receive 77 acres. Arnold and Baker was earmarked to retain ownership of 48 of the 640 acres scheduled for distribution. Arnold and Baker proposed to sell the adjoining 360 acre parcel of real property in order to pay the administrative claims, United States Trustee’s fees, attorney fees, accountant fees, postpetition taxes, the real estate commission due and owing to Walter Arnold, and use the remainder to pay the unsecured creditors. Arnold and Baker retained an interest in the property remaining after distribution and sale.
Both FmHA and Western Cotton initially objected to confirmation of Arnold and Baker’s second amended plan. However, during the course of the confirmation hearing, Western Cotton reached a settlement with Arnold and Baker pursuant to which Western Cotton agreed to accept 130 acres of real property in full satisfaction of its debt. Western subsequently withdrew its objection to confirmation and voted to accept the plan.
For purposes of the confirmation hearing, the parties stipulated that the second amended plan met all the requirements of [11 U.S.C.] § 1129(a)(l — 13) with the exception of subsections (a)(3), (7), and (8). Additionally, FmHA objected to being crammed down pursuant to § 1129(b)(2). The principal factual issue concentrated on the fair market value of Arnold and Baker’s 1320 acres of land. Arnold and Baker estimated the per acre value to be $7,322 for the 640 acre lot, $8,300 for the 360 acre lot, and $8,631 for the 320 acre lot. FmHA *1419 estimated the per acre value for the entire 1320 acres at $1,381.
On May 5, 1993, the bankruptcy court confirmed the plan finding that the property had an estimated value of $7,300 per acre. However, the bankruptcy court modified the transfer to FmHA in the plan by ordering an additional 10% transfer to FmHA in order to compensate it for the costs associated with a sale [resulting in a total of 566.5 acres].
(End of quote from 177 B.R. at 652-53).
FmHA appealed to the Bankruptcy Appellate Panel (“BAP”), which reversed the bankruptcy court’s order confirming the plan. In consolidated appeals, Arnold and Baker and Western Cotton appeal the BAP’s reversal.
II
We first consider the issue of mootness. Appellant Western Cotton[1] argues that the BAP lacked jurisdiction to consider the appeal from the bankruptcy court insofar as the appeal related to the transfer of the 130 acres to Western Cotton, because the transfer was carried out before FmHA obtained a stay of the order confirming the plan. The Bankruptcy Court confirmed the plan on May 5, 1993, and FmHA filed its timely notice of appeal on May 14, one day before the expiration of the automatic stay provided in Bankruptcy Rule 7062. Three days later, on May 17, FmHA filed an emergency motion for a stay of plan confirmation pending appeal. The bankruptcy court held a preliminary hearing on the stay motion on May 20 and issued a temporary stay. However, 36 minutes before that hearing, Arnold and Baker quitclaimed the property to Western Cotton. In a motion for rehearing filed with the BAP, Western Cotton argued that the BAP lacked jurisdiction over the appeal because the appeal was moot as to Western Cotton.[2] The BAP denied the motion.[3]
Mootness is a jurisdictional issue which we review de novo. Baker & Drake, Inc. v. Public Serv. Comm’n (In re Baker & Drake, Inc.), 35 F.3d 1348, 1351 (9th Cir.1994). Western Cotton argues that FmHA’s failure to obtain a stay until after the property was quitclaimed to Western Cotton rendered the appeal moot because the transfer extinguished or modified rights to the extent that a court would be unable to fashion effective judicial relief if FmHA prevailed on appeal.
However, this case presents neither of the two situations in which a dismissal for mootness is warranted. First, a court can dismiss an appeal as moot “if a party opposing a reorganization plan has failed to obtain a stay pending appeal, and the plan has been carried out to ‘substantial [culmination].’” Baker & Drake, 35 F.3d at 1351 (quoting In re Public Serv. Co. (Rochman v. Northeast Utils. Serv. Group), 963 F.2d 469, 473 n. 13 (1st Cir.1992)) (alteration in original). For example, in Trone v. Roberts Farms Inc., (In re Roberts Farms, Inc.), 652 F.2d 793 (9th Cir.1981), the court affirmed a dismissal for mootness of an appeal from an order confirming a plan of reorganization, because “the many intricate and involved transactions” called for by the plan had been “so far implemented that it [was] impossible to fashion effective relief for all concerned.” Id. at 797. Here, in contrast, only a single transaction has been carried out. Fashioning effective judicial relief would hardly require “putting Humpty Dumpty together again.” Baker & Drake, 35 F.3d at 1352.
The other situation in which a court can dismiss an appeal on the ground of mootness is “when an appellant neglected to obtain a *1420 stay pending appeal and the rights of third parties have intervened.” In re Spirtos (Spirtos v. Moreno), 992 F.2d 1004, 1006 (9th Cir.1993). “The classic example of mootness in the bankruptcy context is a case in which the debtor has failed to seek a stay of foreclosure and the debtor’s property has been sold. The transfer to a third party precludes meaningful relief.” Baker & Drake, 35 F.3d at 1351. See also Matter of Combined Metals Reduction Co., 557 F.2d 179, 189 (9th Cir.1977) (dismissing as moot appeals from orders approving and confirming sales and leases made to third parties not before the court). This case does not present such a situation because both Arnold and Baker and Western Cotton are parties to the appeal.[4] The bankruptcy court could fashion effective relief simply by ordering Western Cotton to return the 130 acres to Arnold and Baker. Accordingly, we hold that the appeal is not moot as to Western Cotton.
III
We now turn to the merits. Appellant Arnold and Baker argues that the BAP erred in reversing the confirmation of the plan on the ground that the proposed transfer of 566.5 acres to FmHA would not provide “for the realization by [FmHA] of the indubitable equivalent” of its secured claim, as required by § 1129(b)(2)(A)(iii).[5]
Because FmHA objected to confirmation of the plan, Arnold and Baker invoked the “cram down” provision of Chapter 11, which provides that the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the objection of an impaired creditor “if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.” 11 U.S.C. § 1129(b)(1). To be “fair and equitable” the plan must satisfy, with respect to secured claims, one of the following three tests:
(1) The creditor is to retain the lien securing its claim and is to receive deferred cash payments with a present value at least equal to the claim;
(2) The property securing the claim is to be sold and the lien is to attach to the proceeds of the sale; the lien on the proceeds is then to be treated as described in test (1) or (3);
(3) The creditor is to realize the indubitable equivalent of its secured claim.
See 11 U.S.C. § 1129(b)(2)(A).[6]
The bankruptcy court confirmed the plan on the ground that the plan satisfied the *1421 third requirement. After an evidentiary hearing on the issue of valuation, the court found that the property was worth $7,300 per acre. It then concluded that the receipt of 566.5 acres at $7,300 per acre would provide for FmHA to realize the indubitable equivalent of its secured claim.
As an initial matter, we must address the appropriate standard of review of such a determination. Arnold and Baker argues that the question of indubitable equivalence is a question of fact to be reviewed under the clearly erroneous standard. We disagree. Although the value of the land is a finding of fact which we review for clear error, the ultimate conclusion of indubitable equivalence is a question of law which we review de novo because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code’s “cram down” scheme. See Woods v. Pine Mountain, Ltd. (In re Pine Mountain), 80 B.R. 171, 172 (9th Cir. BAP 1987) (‘Whether a plan provides a secured creditor with the indubitable equivalent of its claim is ... a mixed question of law and fact. Although the facts underlying such a determination are reviewed under the clearly erroneous standard, the question of whether the legal standard has been satisfied is reviewed de novo.”) (citing United States v. McConney, 728 F.2d 1195, 1201-03 (9th Cir.1984) (en banc)). But see Matter of James Wilson Assocs., 965 F.2d 160, 172 (7th Cir.1992) (holding that indubitable equivalence is a question of fact reviewed for clear error).
The BAP reviewed de novo the bankruptcy court’s determination that the proposed transfer would provide FmHA with the indubitable equivalent of its secured claim, and reversed. Stressing that “[t]he determination of whether a partial dirt for debt distribution will provide the creditor with the indubitable equivalence of its secured claim must be made on a case-by-case basis,” Arnold and Baker Farms, 177 B.R. at 662, the BAP reasoned that the bankruptcy court’s valuation of the property was an insufficient basis on which to conclude that the property was the indubitable equivalent of FmHA’s secured claim. Again, we adopt and quote verbatim from the BAP’s opinion at 177 B.R. at 661-62:
The finding of a trial court of a particular value of real property ... will not necessarily determine whether the creditor will receive the indubitable equivalent of its secured claim. Experience has taught us that determining the value of real property at any given time is not an exact science. Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold. Nevertheless, bankruptcy courts have traditionally been requested, out of necessity, to determine the value of various types of property, including real property, and yet courts have recognized the difficulty of being able to determine accurately the value of land. For instance, in In re Walat Farms Inc., 70 B.R. 330 (Bankr.E.D.Mich.1987), the court stated:
Similarly, we concede to doubts about our ability to fix the “value” of the land in question. We need not make a pronouncement that no plan proposing the surrender of a portion of mortgaged land to a mortgagee in return for a compelled release of the lien on the remainder of the property will ever be confirmed. Suffice it to say, however, that no matter how hot the market for real estate may become in the future, the market for farm real estate here and now is not such which would permit us to hold that the value of the land being offered is the indubitable equivalent of [the mortgagee]’s claim. “Indubitable” means “too evident to be doubted.” Webster’s Ninth New Collegiate Dictionary (1985). We profess doubt on the facts of this case.
Walat Farms, 70 B.R. at 334 (footnote omitted)....
[T]he determination of whether a dirt for debt distribution provides a secured creditor with the indubitable equivalent of its secured claim must be madé on a case-by-case basis, and we must decide whether the bankruptcy court’s finding with respect to the value of the real property for the purpose of determining the amount of the *1422 creditor’s secured claim provided the secured creditor with the indubitable equivalent of its claim. In addition, we conclude that in order for a partial distribution to constitute the most “indubitable equivalence,” the partial distribution must insure the safety of or prevent jeopardy to the principal.
Although we conclude that the bankruptcy court’s valuation in this case is not clearly erroneous, we are not convinced that its finding regarding the value of the real property provided the indubitable equivalence of the particular secured claim in question, nor are we convinced that the partial distribution of 566.5 acres to FmHA will insure the safety of or prevent jeopardy to the principal, [citation omitted].
The evidence at trial demonstrated that the value of the real property was far from certain. The Arnold and Baker appraisal admitted that due to unfavorable market conditions, including the fact that the [Resolution Trust Company had acquired 19,-000 acres near Arnold and Baker’s property and was considering bulk sale offers at no more than $2,105 per acre], the normal one year marketing period for the property would be extended by another two years [by which time the appraisal estimated that the Resolution Trust Company’s activities would have ceased affecting the market].
The bankruptcy court agreed with Arnold and Baker’s valuation of $7,300 per acre. FmHA, however, proffered a valuation of $1,381 per acre.[7] The large disparity in the parties’ valuation of the same property illustrates the obvious uncertainty in attempting to forecast the price at which real property will sell at some uncertain future date.
The bankruptcy court found the value of each acre to be $7,300, and thus the value of the 566.5 acres to be transferred to FmHA to be $4,135,450 ($7,300 x 566.5). We must decide, therefore, whether a distribution of land with an estimated value of $4,135,450 constitutes the indubitable equivalent of a $3,837,618 claim secured by 1,320 acres. Under the circumstances of this case, we conclude that it does not.
The partial distribution of 566.5 acres to FmHA will not insure the safety of or prevent jeopardy to the principal. FmHA originally lent funds to Arnold and Baker secured by 1320 acres of land. If Arnold and Baker defaulted on the terms of the note, FmHA bargained for the right to foreclose on the entire 1320 acres of land in order to satisfy the outstanding obligation. In this situation, the principal is protected to the extent of the entire 1320 acres held as security....
If FmHA subsequently sells the property for less than the value calculated by the bankruptcy court, FmHA has no recourse to the remaining collateral to satisfy the deficiency. As a result, the distribution to FmHA may not be “completely compensatory.” See In re Murel Holding Corp., 75 F.2d 941, 942 (2d Cir.1935) (Learned Hand, J.).[8] FmHA is forced to assume the risk of receiving less on the sale without being able to look to the remaining undistributed collateral for security. “[T]o the extent a debtor seeks to alter the collateral securing a creditor’s loan, providing the ‘indubitable equivalent’ requires that the substitute collateral not increase the creditor’s risk exposure.” In re Keller, 157 B.R. 680, 683-84 (Bankr.E.D.Wash.1993); see also Aetna Realty Investors, Inc., v. Monarch Beach Venture, Ltd. (In re Monarch Beach), 166 B.R. 428, 436 (C.D.Cal.1993) (fair and equitable prohibits a plan from unfairly shifting risk of plan failure to the creditor).
(End of quote from 177 B.R. at 661-62).
Arnold and Baker challenges the BAP’s decision on the ground that it conflicts with *1423 Matter of Sandy Ridge Development Corp., 881 F.2d 1346 (5th Cir.1989),[9] in which the Fifth Circuit held that a “dirt for debt” plan satisfied the indubitable equivalence standard.[10] The BAP distinguished Sandy Ridge on the ground that the plan in that case provided for the transfer of all of the secured creditor’s collateral, rather than only a portion of the collateral as in the present ease. Arnold and Baker argues that even in the Sandy Ridge situation, the court’s valuation of the collateral is critical to the creditor’s substantive rights because the valuation directly impacts the creditor’s rights regarding an unsecured deficiency claim, as was the case in Sandy Ridge.
However, this argument misapprehends the indubitable equivalence analysis. Section 1129(b)(2)(A)(iii) does not require that a creditor receive the indubitable equivalent of its entire claim, but only of its secured claim. See Sandy Ridge, 881 F.2d at 1350; 11 U.S.C. § 1129(b)(2)(A)(iii) (“With respect to a class of secured claims, the plan provides ... (iii) for the realization by such holders of the indubitable equivalent of such claims.”) (emphasis added). Sandy Ridge explained that, in the case of an undersecured creditor,
[s]ection 506(a) of the Bankruptcy Code bifurcates ... [the] total claim into secured and unsecured portions____ In situations involving only one creditor and one debtor, the value of the undersecured creditor’s secured claim is simply the value of the underlying collateral. The difference between the collateral’s value and the amount of the debt becomes an unsecured claim and is added to the existing pool of unsecured claims.
Sandy Ridge, 881 F.2d at 1349 (citations omitted). In other words, the value of the secured portion of an undersecured creditor’s total claim is by definition equal to the value of the collateral securing it. Therefore, a creditor necessarily receives the indubitable equivalent of its secured claim when it receives the collateral securing that claim, regardless of how the court values the collateral. For this reason, the Sandy Ridge court did not need a judicial determination of value, explaining that “for the present analysis, the exact value of [the collateral] is unimportant.” Id. at 1349. The court’s valuation of the collateral does, as Arnold and Baker observes, determine the amount of any remaining unsecured claim, but the Code requires only that the creditor receive the indubitable equivalent of its secured claim.
In this case, in contrast, the amount of collateral deemed to be the indubitable equivalent of FmHA’s secured claim depends entirely on the court’s valuation of the collateral. If the court had found that the land was worth more than $7,300 per acre, FmHA would receive correspondingly less land, and if the court had found that the land was worth less, FmHA would receive correspondingly more. Our holding that this plan does not satisfy the indubitable equivalent requirement is therefore entirely consistent with Sandy Ridge’s holding that the plan in that ease did.
CONCLUSION
In conclusion, while we do not hold that the indubitable equivalent standard can never as a matter of law be satisfied when a creditor receives less than the full amount of the collateral originally bargained for, we do *1424 hold, as did the BAP, that the Arnold and Baker plan does not provide FmHA with the indubitable equivalent of its secured claim as required by the Bankruptcy Code.
The judgment of the BAP reversing the bankruptcy court’s order confirming the plan is AFFIRMED.

. Western Cotton is now known as Anderson Clayton Financial Services Corporation. We use its former name for the sake of consistency with the BAP opinion.

. Western Cotton also appeals the BAP’s denial of Western Cotton's motion for an extension of time for filing the motion for rehearing. Because the BAP addressed the motion for rehearing on the merits notwithstanding its denial of the extension, we do not address this issue.

.The BAP based its denial of the motion on Western Cotton’s concession at oral argument that the appeal was not moot. However, Western Cotton correctly points out that mootness is a jurisdictional issue, which this court must consider despite Western Cotton’s apparent concession. Baker & Drake, Inc. v. Public Serv. Comm’n (In re Baker & Drake, Inc.), 35 F.3d 1348, 1351 (9th Cir.1994).

. Western Cotton responds that the transfer did affect the rights of others who are not parties to the appeal, namely, certain other entities who are co-liable on the indebtedness. However, Western Cotton cites nothing in the record identifying any such entities or evidencing any co-liability on their part.

. Appellee FmHA, in addition to addressing this issue, also raises a number of other issues apparently as alternative grounds for denying confirmation of the plan. FmHA argues that the bankruptcy court's valuation of the land was clearly erroneous and that the bankruptcy court erred in holding that the plan satisfied the "best interests of the creditors” test provided in § 1129(a)(7) and the requirement of good faith provided in § 1129(a)(3). Because we affirm the BAP on the issue of indubitable equivalence, we need not address the other issues raised by FmHA.

. The full text of the statute provides, in relevant part:
(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
(A) With respect to a class of secured claims, the plan provides—
(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder’s interest in the estate's interest in such property;
(ii) for the sale, subject to section 363(k) of this title, pf any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or
(iii) of this subparagraph; or
(iii) for the realization by such holders of the indubitable equivalent of such claims. 11 U.S.C. § 1129(b)(2)(A).

. The disparity was due in part to the parties' disagreement about the highest and best use of the property. Arnold and Baker argued that it was for land development, whereas FmHA maintained that it was for an irrigated farm. See Arnold and Baker Farms, 177 B.R. at 655.

. The legislative history of § 1129 indicates that Murel Holding was the source of the "indubitable equivalence” standard. See Matter of Sandy Ridge Development Corp., 881 F.2d 1346, 1350 (5th Cir.1989); 124 Cong.Rec. H 11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S.Code Cong. & Admin.News 6436 at 6475.

. Arnold and Baker also cites a number of decisions from bankruptcy courts approving dirt for debt plans. See Matter of Atlanta Southern Business Park, Ltd., 173 B.R. 444 (Bankr.N.D.Ga.1994) (plan called for part of collateral plus sum of cash to be transferred to creditor in full satisfaction of creditor's claim); In re Simons, 113 B.R. 942 (Bankr.W.D.Tex.1990) (plan called for part of collateral to be transferred in exchange for credit against claim; balance of claim to be paid off by deferred payments and secured by lien on remaining collateral); In re Elm Creek Joint Venture, 93 B.R. 105 (Bankr.W.D.Tex.1988) (same); In re Bernard, 70 B.R. 181, 185 (Bankr.E.D.Ark.1986) (same); In re Shorten, 49 B.R. 722, 724 (Bankr.W.D.Mo.1985) (same).
However, none of the plans in these cases required a secured creditor to accept part of its collateral in full satisfaction of its secured claim.

. A subsequent opinion denying the petition for rehearing clarifies that this was the holding of Sandy Ridge. See Matter of Sandy Ridge Development Corp., 889 F.2d 663, 663 (5th Cir.1989) (Sandy Ridge II) (“In denying the petition for rehearing, we observe that we have held that ... the plan in question meets the requirements of 11 U.S.C. § 1129(b)(2)(A)(iii)....”).